Jonas **WHALEY** and June Whaley, Plaintiffs–Appellees,

v.

**RHEEM MANUFACTURING COMPANY,** Defendant–Appellant.

Court of Appeals of Tennessee, Eastern Section.

Feb. 27, 1995.

Application for Permission to Appeal Denied by Supreme Court May 30, 1995.

Paul D. Hogan, Jr. & Janet L. Hogan of Hogan & Hogan, Knoxville, for defendant-appellant.

Timothy A. Deere, Chattanooga, for plaintiffs-appellees.

*OPINION*

SUSANO, Judge.

This is a products liability case. Rheem Manufacturing Company (Rheem) appeals from the trial court's judgment that approved a jury verdict awarding the plaintiffs Jonas Whaley and his wife, June Whaley, $475,000 in compensatory damages for property losses suffered by them when their home in Decatur, Meigs County, and its contents were consumed by fire on March 19–20, 1988. The trial court submitted the plaintiffs' case to the jury on the sole issue of whether Rheem was liable on the theory of strict liability in tort. It was and is the position of the plaintiffs that a Rheem heat pump, part of which was located in the basement of their home, was defective and that its defective condition was the cause of the fire.

## I

As taken verbatim from its brief, Rheem raises the following issues on this appeal:

1. Whether the plaintiffs' unsupported assumptions that the fire started in the Rheem unit were sufficient evidence of a product defect to overcome the statutory presumption that a product is not unreasonably dangerous or defective if it meets government standards when manufactured?

a. Whether proof of defect can be hypothesized without any opinion as to how it arose?

b. Whether a product defect can be inferred when other explanations for the fire are not eliminated?

2. Whether the trial judge erred by permitting the plaintiffs' experts to give opinion based on unproven hypothetical facts, and a fire cause and origin investigation that was not conducted in accordance with customary procedures?

a. Whether expert opinion should have been excluded based on unreliability of underlying facts?

b. Whether Mr. Love's opinions about fire cause and origin were competent and reliable conclusions when the investigation of the fire scene was not made until four and one-half years after the fire and after complete restoration of the site?

3. Whether comparative negligence and assumption of the risk are applicable to products liability actions and should have been charged by the judge, as requested by defendant's counsel?

4. Whether plaintiffs' damage proof was based on the applicable measure of damages or plaintiffs' personal knowledge of value?

## II

The Whaleys are in their seventies. They were married in Baltimore, Maryland, in 1958. They lived in Baltimore until the mid–1980's. In 1984, they bought a house and 265 acres in Decatur, Tennessee, for $240,000 plus. Mr. Whaley retired and moved there in 1985. After visiting back and forth for two years, the Whaleys were reunited when Mrs. Whaley retired and moved to the Meigs County home. They have lived together on their Meigs County property continuously since 1987.

On the morning of March 19, 1988, Mrs. Whaley drove to the barn on the premises to feed and water the livestock. Mr. Whaley had left the residence earlier that morning to go to Knoxville. The Rheem heat pump was heating the house that morning as the outside temperature was in the high 20's to low 30's. Between 9:30 and 10:00 a.m., Mrs. Whaley was about 600 to 700 feet from and to the east of the house when she "saw smoke curling out of the eaves on the south side of the house, not a lot of smoke but some smoke curling." She "jumped" in her truck "and rushed up to the house to see what was wrong." When she entered the west side or rear of the house, she went to the kitchen, which is an interior room located in the middle of the first floor. In the kitchen, she saw "yellow ... golden flames" about six inches high and brown smoke between the upper and lower cabinets in the southeast corner of the kitchen. The flame and smoke were along the kitchen wall. She described the scene as "little flames, ..., just flicking through the wall and there was smoke kind of at eye level." The cabinets and the counters were not on fire at that time. The kitchen "wasn't full of smoke or anything, but heavier at the top and lighter at the bottom." The smoke was described as a "smooth kind of flowing smoke ... coming my direction." The flames were characterized as being "steady ... as if they're seeping through a hole or something." It was a slow fire—"just a little flame." There were no electrical appliances or electrical outlets in the kitchen area where Mrs. Whaley saw the flames.

After taking her cat and two dogs to safety, she rushed to a tenant house on the property and woke up her tenant who called the fire department. The fire truck arrived in approximately 20 minutes. With the assistance of neighbors, Mrs. Whaley was able to get a minimal amount of possessions out of the house. The fire department was finally able to extinguish the fire after a "couple of hours." Mrs. Whaley described the damage as "moderate or greater." The furniture "was all damaged." In addition to fire damage, there was steam and water damage.

Mrs. Whaley testified that there was no fire associated with the refrigerator or other appliances in the kitchen. When the fire was thought to be extinguished, Mrs. Whaley noticed that the lower cabinet on the kitchen wall, where she had observed the flames, was burned and there was a big hole in the bottom of it going down to the basement. At that particular point on the wall, there was, on the other side of the wall, a return air duct adjacent to the foyer closet. The duct went down to the Rheem heat pump that was by itself in the basement directly below the hole. An electrical panel and the hot water heater were also located in the basement, but they were not near the Rheem heat pump. There were no other heat sources or electrical outlets near the heat pump. There was no gasoline or personalty stored in the basement.

Mrs. Whaley, her husband (who had returned to Decatur later the same day), and others were at the house until 8:00 p.m. or later that night. The fire department was called back once to water down a hot spot. After that, the fire department "seemed to think everything was all right" so they left the premises.

That evening, the Whaleys stayed with neighbors. About 11:00 that night, Mr. Whaley went back to the house to make sure the fire was out. He did not notice anything suspicious. He returned to the neighbor's house and the Whaleys retired for the evening. About 1:00 or 1:30 a.m. the next morning, March 20, the Whaleys received a phone call advising them that the house was again

on fire. The house, a two-story structure, burned to the ground, destroying essentially all of its contents.

Experts hired by the Whaleys determined that the Rheem heat pump had malfunctioned as a result of a manufacturing defect. That malfunction was identified by the plaintiffs' experts as the cause of the fire.

As the third year anniversary of the fire approached, the plaintiffs filed suit against Rheem and other defendants. The plaintiffs' claims against the other defendants were dismissed by the trial judge at various stages in the proceedings. The propriety of these dismissals is not raised by the plaintiffs as an issue on this appeal. All theories as to the defendant Rheem were also dismissed[1] by the trial judge except the plaintiffs' claim under strict liability in tort. That claim was submitted to the jury who returned a verdict for the plaintiffs in the amount of $475,000. The verdict was approved by the trial court and this appeal followed.

### III

This suit is controlled by the Tennessee Products Liability Act of 1978 (Act), as amended. The definition section of the Act, T.C.A. § 29–28–102, provides, at subsection (6), that a

> "[p]roduct liability action" for purposes of this chapter shall include all actions brought for or on account of ... property damage caused by or resulting from the manufacture, ... of any product. It shall include, but not be limited to, all actions based upon the following theories: strict liability in tort; ...

The Act further provides that

> [a] manufacturer or seller of a product shall not be liable for any injury to ... property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.

T.C.A. § 29–28–105(a). The Act defines "defective condition" as "a condition of a product

that renders it unsafe for normal or anticipatable handling and consumption." T.C.A. § 29–28–102(2). "Unreasonably dangerous" is defined in the Act to mean

> that a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller assuming that he knew of its dangerous condition.

T.C.A. § 29–28–102(8).

■ In order to prevail in a products liability action, a plaintiff must prove that the product in question was either defective or unreasonably dangerous, as those concepts are defined in the Act, at the time it left the control of the manufacturer or seller. *Tatum v. Cordis Corp.,* 758 F.Supp. 457, 460 (M.D.Tenn.1991); *Curtis v. Universal Match Corp.,* 778 F.Supp. 1421, 1425 (E.D.Tenn. 1991); *Browder v. Pettigrew,* 541 S.W.2d 402, 404 (Tenn.1976). "These statutory definitions essentially codify the 'consumer expectation test' as the basis in Tennessee for assessing products liability." *Tatum* at 461.

■ A defect in a product may be proven by direct evidence, circumstantial evidence, or a combination of both. *Browder* at 405. In layman's terms, the plaintiff must prove that " 'something was wrong' with the product." *Id.* at 406, quoting from the case of *Scanlon v. General Motors Corp.,* 65 N.J. 582, 326 A.2d 673 (1974). The mere occurrence of an accident is not sufficient to prove a defect, *Browder* at 406; but as *Browder* points out, again by way of a quote from the *Scanlon* case:

> However, additional circumstantial evidence, such as proof of proper use, handling or operation of the product and the nature of the malfunction, may be enough to satisfy the requirement that something was wrong with it. ... (Citations omitted). Further, a defective condition can

---

1. The dismissal by the trial judge of the other theories of recovery against Rheem is not raised by the plaintiffs as an issue on this appeal.

also be proven by the testimony of an expert who has examined the product or who offers an opinion on the products [sic] design.

*Scanlon*, 326 A.2d at 677–78.

It almost goes without saying that the identified product defect must be the proximate cause of the plaintiff's injury. *Browder* at 405. "Strict liability is not absolute liability. It is not enough to show that the product caused the plaintiff's injury or was involved in it. The plaintiff must show that there was something wrong with the product." *Tatum* at 461.

In Tennessee, the general rule is that "the issue of whether a product is defective or unreasonably dangerous is one for the jury." *Curtis* at 1427.

IV

This is a jury case. The question for our resolution is clear. Is there material evidence to support the jury's verdict? *See* Tenn.R.App.P. 13(d). The rule is well stated in *Lowe v. Preferred Truck Leasing, Inc.*, 528 S.W.2d 38 (Tenn.App.1975) (Goddard, J.):

This Court does not sit as a jury of three to reweigh the evidence in jury cases. Once a jury, who has the opportunity of seeing and hearing the witnesses themselves, has determined the factual issues involved in a law suit and that determination has been approved by the Trial Judge, we may only review the evidence to ascertain if there is any credible evidence upon which that determination may be predicated. If there is, then even if we believe that the trier of fact has reached an erroneous decision, we must accept it. As is well known to all who practice before the appellate courts of this state, the burden of showing that there was no credible evidence to support a jury verdict is a massively heavy one to bear.

However, this does not mean that we must passively sit by and allow patently impossible, incoherent, or perjured testimony to support a jury verdict. The rule is that there must be some credible evidence—not merely some evidence—to support a jury verdict. That is, there must be some evidence which is capable of being believed by

reasonable men, although we may not choose to believe it ourselves.

*Id.* at 41. *See also Grissom v. Modine Mfg. Co.*, 581 S.W.2d 651, 652 (Tenn.App.1978). Our task, as an appellate court sitting in review of a jury verdict, was recently reviewed by the Supreme Court in the case of *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822 (Tenn.1994):

The appellate courts do not determine the credibility of witnesses or weigh evidence on appeal from a jury verdict. Appellate courts are limited to determining whether there is material evidence to support the jury's verdict. Where the record contains material evidence supporting the verdict, the judgment based on that verdict will not be disturbed on appeal. (Citations omitted).

*Id.* at 823.

We now turn our attention to the evidence regarding the defective condition, if any, of the Rheem heat pump, its causal relation, if any, to the fire, and the issues raised by the appellant regarding these factual matters. We do this to determine if the appellant has carried its "massively heavy" burden of showing that there is no material evidence to support the jury's verdict in this case. *Lowe* at 41.

V

In stating its first issue, and we have purposely copied the issues verbatim from the brief, Rheem alludes to "the plaintiffs' unsupported assumptions," asserts that the statutory presumption of T.C.A. § 29–28–104 has not been "overcome," talks about hypothesizing a defect "without any opinion as to how it arose," and asks "whether a product defect can be inferred when other explanations for the fire are not eliminated." In addition to examining and analyzing the testimony of the plaintiffs' experts, the defendant compares that testimony with the scientific and technical testimony offered by the defendant. The defendant's approach is obviously one of comparing and weighing *all* of the evidence heard by the jury. As the cases

cited herein[2] clearly teach, this is not our function. We look *only* to the evidence tending to prove the case accepted by the jury to determine if that proof demonstrates material evidence of a defect, a causal relationship to the fire, and, as questioned in Rheem's fourth issue, damages proximately caused by the fire. We believe that our review of the relevant evidence demonstrates that there is material evidence to support the jury's verdict.

A case involving a heat pump of the type at issue in this case is one where "scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue ..." Tenn.R.Evid. 702. Generally speaking, a plaintiff will need expert testimony to demonstrate a defect in a piece of machinery such as a heat pump. The workings of a heat pump are beyond the common knowledge of laymen. To explain how such a piece of machinery works, one needs "special knowledge, skill, experience, or training." Tenn.R.Evid. 701.

The plaintiffs called James E. Geiger, an electrical engineer, as their expert in the field of electricity and electrical products. We will not explore his qualifications to testify regarding the Rheem heat pump at issue in this case because, as we will discuss later in this opinion, the defendant did not object to the plaintiffs' efforts to qualify Mr. Geiger as an expert to testify on the operation of the heat pump in this case.

Mr. Geiger had examined the indoor part of the heat pump 19 days after the fire. He testified that the internal parts of the unit demonstrated fire damage which could not have been caused by a house fire. He stated that this internal damage was consistent with a fire of electrical origin. According to him, such fires can reach 3000–4000 degrees Fahrenheit. A normal house fire reaches a maximum temperature of 1500–1600 degrees.

Mr. Geiger focused on a safety device in the unit. This device is designed to interrupt the flow of current to the heater. Based on his inspection of the unit, he determined that this device "did not operate at a sufficiently low enough temperature to prevent this fire." As a result of this defective condition, the heat pump continued to operate despite the high temperature. A "blow torch" effect was created and "in the presence of a flame it would increase the temperature of the flame by supplying additional oxygen to it." The temperature would reach "2800, 3000 degrees, it will melt steel."

After discussing his findings, Mr. Geiger was asked the following questions and gave the answers indicated:

Q: Do you have an opinion based upon the knowledge of what you observed and your investigation and your interviews and of course looking at the machinery by yourself and then after it was broken down, do you have an opinion as to whether this product, this Rheem heat pump, was in a defective—excuse me, unreasonably dangerous and defective condition? First, do you have an opinion?

A: Yes, sir, I do.

Q: What is that opinion?

A: My opinion is that this particular unit was defective and unreasonably dangerous at the time that it left the manufacturer.

Q: All right.

A: In that the safety devices, the high temperature devices, did not operate at a sufficiently low enough temperature to prevent this fire.

Rheem did not object to these opinion-seeking questions on the ground that they sought opinions beyond the competency of the witness; or on the ground that they were based on "underlying facts or data [that] indicate lack of trustworthiness." *See* Tenn.R.Evid. 703. The testimony elicited in response to the questions came into evidence via an expert in the field. He was testifying about a subject beyond the common knowledge of laymen. His opinions as to the defective condition of the heat pump; the key role that the defective condition played in propagating a fire of electrical origin; and the existence of that latent condition in the heat pump when it left the manufacturer were material evidence of those facts—facts that were essential to the plaintiffs' claim. As the *Brow-*

**2.** See cases cited at p. 300 of this opinion.

*der* case points out, "a defective condition can ... be proven by the testimony of an expert who has examined the product ..." *Id.* at 406.

On direct examination, an expert can express his opinion and the reasons for that opinion "without prior disclosure of the underlying facts or data, unless the court requires otherwise," Tenn.R.Evid. 705; but in this case, Mr. Geiger dealt on his direct examination not only with his opinions and reasons for those opinions, but also dealt extensively with the underlying facts that led to those reasons and opinions. We cannot say that his testimony was "patently impossible, incoherent, or perjured." *Lowe* at 41. On the contrary, it was reasoned and logical. It was material evidence of the facts indicated. It was before the jury for it to consider as the trier of fact.

The plaintiffs also called Charles Love, a former Chattanooga police officer who worked with the Chattanooga fire department in its fire investigation unit from 1977 to 1982. He testified that he investigated over 4,000 fires while employed by the City of Chattanooga. Since 1978, he has investigated fires for insurance companies and private individuals. He was qualified by the plaintiffs as an expert in the origin and cause of fires.

Mr. Love testified that based on his review of the relevant data he was of the opinion that the fire originated in the Rheem heat pump. He was of the opinion that the "second" fire in the early morning hours of March 20 was a "rekindle" of the first fire. His ultimate opinions are reflected in the following questions and answers:

Q: Let's take the first one, first fire, do you have an opinion to a reasonable degree of cause and origin certainty as to what—

A: In my opinion—

Q: —as to what caused this fire? First, do you have an opinion?

A: Yes, I do.

Q: All right. Tell us what it is.

A: All right. It is my opinion that the fire was caused by an internal overheating in the Rheem heat pump, with the heat going up into the surrounding wood where it feeds through and igniting this wood and this wood then eventually feeds through the house.

\*    \*    \*    \*    \*    \*

Q: Okay. Now, given that experience and the investigation and elimination process and your interviews and facts that you've garnered in this, do you have an opinion to a reasonable degree of scientific and cause and origin certainty as to whether the devastating fire later on that night was caused by this Rheem heat pump unit and the rekindle from it?

MR. HOGAN: Your Honor, I—

Q: First, do you have an opinion?

MR. HOGAN: If he's got one then I will.

THE COURT: All right. Answer the question, do you have an opinion?

THE WITNESS: Yes, I do.

MR. HOGAN: Okay. Your Honor, we'd object to that, the only facts before this jury between eight o'clock and 1:30 in the morning is that Mr. Whaley went into the place and there was no sign of the fire. That's all, that's the only possible basis, that's the only facts before this Court that this man can use in order to reach that opinion. He's not testifying that he ever did a cause and origin for the second fire. We object. It's pure speculation for him to do that, pure conjecture.

THE COURT: I'm going to allow the witness to testify. You will have the right to cross examine.

Q: (By Mr. Deere) What's your opinion as to the devastating fire that burned this house down, Mr. Love?

A: It is my opinion that it was a rekindle which was a result of the original fire which originated from the heat and air unit.

There is credible material evidence in the record before us that the Rheem heat pump was defective and unreasonably dangerous when it left the control of the defendant. There is also credible material evidence that the defective condition caused the fire.

The defendant misconstrues our function. It argues, for example, that the experts' deposition testimony is not consistent with their

in-person testimony in court; and that there are inconsistencies in the court testimony itself. What Rheem invites us to do is to weigh the evidence. In effect, we are encouraged to compare the plaintiffs' proof with the defendant's proof. This is not our role. This is why a jury was impaneled. The jury chose to believe the plaintiffs' proof that the fire was caused by a defective condition in the Rheem heat pump. Whether we agree with the jury is immaterial. This is a jury trial. The only question we must decide is whether there is in the record before us material evidence which makes out the plaintiffs' case. We have concluded there is. The defendant's first issue is found to be without merit.

The defendant next argues that the trial court erred when it admitted into evidence the expert opinions expressed by James E. Geiger and Charles Love. Each was qualified as an expert in his field. While those qualifications were subject to vigorous cross examination, the defendant, in the final analysis, did not object to either expert testifying in his field of expertise.

Both Mr. Geiger and Mr. Love expressed opinions within their respective fields. With one exception, those opinions were expressed without objection from the defendant. Each witness was qualified to give the opinions expressed by him. With the exception of the matter addressed in the next paragraph, it is too late now to object to the witnesses' qualifications and opinions. These objections were waived when they were not first presented to the trial judge.

▇ The defendant did object to Mr. Love's expressing an opinion that the second fire was a rekindle from the first fire on the ground that this opinion was based on "speculation." As a foundation for the expression of this opinion, Mr. Love was questioned extensively about "rekindles":

Q: (By Mr. Deere) All right. Do you have in your—Mr. Love, in your training and experience and work life and all of the years that you've done this, do you have knowledge and training in rekindle?

A: Yes, I do.

Q: All right. Tell us about what all you learned or study or how that fits in with—

A: In fire fighting—

Q: —your experience.

A: In fire fighting one of the problems that you have is you can't get all of the hot spots out unless you just run a bulldozer through the house. There's always hidden glowing embers so it's a common problem to have what we call a rekindle. In Chattanooga we tried to leave a unit on the scene for several hours in case we had rekindles because these are quite common. Sometimes in spite of everything you do you'll have several rekindles and sometimes they'll go ahead and burn a house down.

\* \* \* \* \* \*

Q: Have you run across them in your experience?

A: Many, many, many, many rekindles.

Q: All right. And explain to the jury how—with a—from your experience and training how does a rekindle survive a wetting down of this magnitude?

A: All right. If I might use an example of this room. If I spray water on this wall right here because there's a fire on it (Indicating), the water is not going through the wall, it's not going down into the bottom of the wall, it's not going up into the wall, I've got a barrier there.

A house is full of barriers, you have little spaces and in these little spaces you have pockets of glowing embers. A fire will insulate as it burns. It will burn down. Like a mattress, a mattress is extremely hard to get out. You just need to throw them out. They'll look like they're out, the smoke is off of them but they're not, on down inside you can't see it but there will be these glowing embers. And these are all through the house, in the furniture, in the structure itself.

Q: How many different floors—from what you've learned, how many different floors were involved in that first fire and in the first attempt to put it out?

A: There were two—there was a basement, first floor and second floor.

Q: Okay. And then the—what did the first witness tell you about where the smoke was coming from when she saw it from out in the pasture?

A: From out in the attic.

\* \* \* \* \* \*

Q: How many different—we've established that many floors, whatever you said, how many different walls were involved as you recall or if you know?

A: Well, it involved more flooring than walls.

Q: Okay.

A: It involved the basement flooring which is the kitchen floor, it involved this, it involves the closet which in the rear of the closet is where we have the duct work going up and it involved this closet, it involved the overhead area which is your second floor, it involves this and it burned through up into the second floor, and then the second floor it spreads over into a bedroom. So it involves the basement, first floor, second floor, the first fire.

Q: What's the significance of having your involvement in this first fire in these walls and closets and floors as opposed to if you had a fire sitting out open where it could be contained easily, what's the significance of that?

A: This tells me that I've got a vented fire which is following a path of least resistance. It's not having to travel laterally to seek its oxygen. It's basically going up. Now, you will have some lateral spread but about 80 percent of it is going up.

\* \* \* \* \* \*

Q: Okay. Now, did you talk to Mrs. Whaley about how long she stayed on and how long they were there and then how long the firemen with their equipment were there?

A: Yes, I did.

Q: All right. And did you talk to her about the timing and when these rekindles and hot spots flared up?

A: Yes, I did.

Q: All right. Now, given the facts of the location of the fire in the walls and floors and attics and ceilings and duct work, and given the length of time they stayed and the fact of the involvement of this fire on four different levels, do you have an opin-

ion—and given your experience with—how many fires would you say you were involved in where there were rekindles and burndowns after—

A: I said many, many, many. I don't have an exact number, it's very common.

Q: All right. Would you—are you able to quantify it as more or less than 50?

A: I would say five or 600.

The witness' opinion was not speculative in nature. The first fire burned for two to three hours. After the fire department left, a hot spot was discovered and the department had to be called again. Based on Mr. Love's testimony regarding "rekindles," it is a reasonable inference from the facts that the second fire was nothing more than a rekindle or continuation of the first fire. There was no testimony to raise a suspicion of arson *after* the first fire. This house was located on a large tract of land. No one of a suspicious nature was seen around the premises.

The jury heard the opinions expressed by the plaintiffs' experts. It also had before it the extensive, vigorous, and artful cross-examination of those witnesses by Rheem's counsel. It also heard opinions from Rheem's witnesses that were diametrically opposed to the opinions of Mr. Geiger and Mr. Love. Such is the product of the adversary system. The jury heard both sides. It chose the competent and admissible testimony of the plaintiffs' experts. This it had the right to do. We do not serve as a jury or as a substitute for a jury. Our limited role on the facts ends when we find credible material evidence. It is not necessary that we agree with the jury. The plaintiffs' second issue is found to be without merit.

■ The defendant next argues that the trial court erred in failing to charge comparative negligence and assumption of the risk. These are affirmative defenses. They must be pled. *See* Tenn.R.Civ.P. 8.03. The only affirmative defenses set forth in the answer were stated in that pleading in the following manner:

These defendants rely on all of the defenses contained in the Tennessee Products Liability Act.

This averment does not include the defense of comparative negligence or assumption of

the risk. A trial court will not be placed in error for failing to instruct the jury on an issue not made in the pleadings or otherwise tried by consent of the parties. *Atkins v. Kirkpatrick,* 823 S.W.2d 547, 551 (Tenn.App. 1991); *Cook v. Spinnaker's of Rivergate, Inc.,* 846 S.W.2d 810, 812 (Tenn.1993). Furthermore, as the trial judge correctly ruled, the evidence in this case did not warrant a charge on either of these affirmative defenses.[3]

■ Finally, the defendant argues that there is no material evidence to support an award of damages of $475,000. Mrs. Whaley testified that her house, which was totally destroyed by the fire, separate and apart from the acreage, was worth $180,000 to $200,000. She testified [4], without objection, that the value of the personalty lost in the fire was worth $500,000. She produced an inventory of her lost personal items that consisted of 272 pages. The pages totaled $542,062. She testified that when the parties' possessions were moved from a smaller home in Baltimore to the residence in Meigs County they weighed ten tons. She testified in detail that her collection of these items started when she was a child. She is now in her seventies. The lists reflect an extensive collection of antiques. There was credible material evidence to support an award of $475,000.

The trial court's judgment is affirmed and this cause is remanded to the trial court for the collection of costs and such other action as may be appropriate. The costs of this appeal are taxed against the appellant and its surety.

GODDARD, P.J. (E.S.), and INMAN, Senior Judge, concur.

---

3. Under the *McIntyre* doctrine of comparative fault, the defense of assumption of the risk has been abolished. *Perez v. McConkey,* 872 S.W.2d 897 (Tenn.1994). The Supreme Court presently has before it the issue of whether comparative fault applies in strict liability products liability cases. Since these matters were not raised below, we do not address them on this appeal.

4. "Q [by Rheem's counsel] ... Now, those values that you placed on them, are they of your own knowledge and from your experience?

