IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 21, 2003 Session

# THOMAS A. BRONSON, JR., ET AL. v. HORACE RICKY UMPHRIES, ET AL.
# HORACE RICKY UMPHRIES, ET AL, v. NORFOLK SOUTHERN RAILWAY COMPANY
# PAUL S. SCHRIER, ET AL v. NORFOLK SOUTHERN RAILWAY COMPANY, ET AL

### A Direct Appeal from the Circuit Court for Shelby County
### Nos. 73811, 75257, and 75216, The Honorable John R. McCarroll, Jr., Judge

-------

### No. W2002-01260-COA-R3-CV - Filed August 25, 2003

-------

This appeal is from judgments on jury verdicts in a wrongful death case and personal injury cases resulting from a collision of a freight train with a vehicle. Suits were filed for the wrongful death and personal injury claims against the railroad, and the passengers in the vehicle also sued the owner and driver of the vehicle. The cases were consolidated for trial, and the jury returned a verdict for defendant railroad in all cases. The jury also returned a verdict awarding damages for plaintiffs' in their suit against the driver and owner of the vehicle. Judgments were entered on the jury verdicts, and all plaintiffs appealed. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

John D. Richardson, Teresa A. Boyd, For Appellants, Horace Ricky Umphries, As Administrator of the Estate of Nicholas L. Umphries, Deceased, Horace Ricky Umphries, Individually, and Julia Ann Umphries, Individually

James H. Wettermark, Birmingham, Alabama; Stephen R. Leffler, Memphis, For Appellants, Thomas M. Bronson, Jr., Deborah J. Bronson,and Matthew M. Bronson

S. Russell Headrick, Jennifer Ziegenhorn, Memphis, For Appellants, Paul A. Schrier, Individually, and David Schrier's Appeal

Everett B. Gibson, Ralph T. Gibson, Scott B. Peatross, Memphis, For Appellee, Norfolk Southern Railway Company

**OPINION**

This case arises from a grade crossing accident between a Norfolk Southern freight train and a 1985 Ford Bronco. The collision occurred shortly before midnight on January 14, 1995, at the intersection of Poplar Avenue and Old Bailey Station Road in Collierville, Tennessee. 15-year-old Matthew Bronson, and 15-year-old David "Skip" Schrier were passengers in the Bronco that 16-year-old Nicholas Umphries was driving.[1] As a result of the collision, Nicholas Umphries died and Matt Bronson and Skip Schrier were seriously injured.[2] Suits were filed for wrongful death and personal injuries in the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis as follows:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Thomas M. Bronson, Jr., Individually and Matthew S. Bronson by
Thomas M. Bronson, Jr. and Deborah J. Bronson, as Parents and
Legal Guardians,

Plaintiffs

Vs.                                                No. 73811-1 T.D.

Horace Ricky Umphries, as Administrator of the Estate of Nicholas
L. Umphries, deceased; Horace Ricky Umphries, an Individual;
Norfolk Southern Railway Company, a Corporation

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Paul S. Schrier, Individually and as Next Friend and Father of
David Schrier, a minor[3]

Plaintiffs

---

[1] Skip Schrier was the front passenger and Matthew Bronson was seated behind the driver.

[2] Dr. O.C. Smith, the Shelby County Medical Examiner, testified that the medical report of Nicholas Umphries revealed a lack of alcohol or other drugs in Umphries' bloodstream on the night of the accident.

[3] The suit against Umphries was dismissed by order of court filed February 29, 1996, and by order dated December 15, 1998, David Schrier, upon reaching his majority, was substituted in the action for his individual cause of action.

Vs.                                        No. 75257-1 T.D.

Norfolk Souther Railway Company, a corporation, and Horace
Ricky Umphries, Individually and as Administrator of the Estate of
Nicholas L. Umphries, deceased,

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Horace Ricky Umphries, Administrator of the Estate of Nicholas L.
Umphries, deceased; Horace Ricky Umphries, Individually and
Julia Ann Umphries,

Plaintiffs

Vs.                                        No. 75216-1 T.D.

Norfolk Southern Railway Company

Defendant

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

By order entered July 24, 1997, the suits were consolidated for all purposes and are so consolidated in this appeal.

The first trial of this cause began on February 8, 1999 and was terminated due to mistrial on February 15, 1999. The mistrial was the result of NSR's performing tests and experiments on buried cables at the accident scene during the trial without first giving notice to the other parties. When NSR sought to introduce the test results into evidence, the trial court granted a mistrial.

On November 15, 2001, Horace Ricky Umphries filed a Motion *in Limine* to Exclude Testing Performed by Norfolk Southern Railway Company conducted by NSR on February 11, 14 and March 6, 1999.

This cause was tried to a jury from November 19 through December 20, 2001. The jury returned verdicts in all three cases exonerating NSR. Specifically, the jury found that NSR was 0% at fault and that the driver, Nicholas Umphries, was 100% at fault. The jury awarded the Bronsons $6,920,669.32 against Horace Ricky Umphries. A Judgment on Jury Verdict was entered on January 25, 2002. The Judgment reads, in relevant part, as follows:

> The foregoing jury returned a verdict finding that defendant,
> Norfolk Southern Railway Company, was not at fault in the accident
> out of which this cause arises, and that the sole cause of the accident

-3-

was the negligence of Nicholas L. Umphries, deceased. The jury awarded damages to Matthew S. Bronson, by Thomas M. Bronson, Jr., and Deborah J. Bronson, as parents and legal guardians, in the sum of $6,500,000.00, and to Thomas M. Bronson, individually, in the sum of $420,669.32.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED as follows:

1. Upon the verdict of the jury in this cause, judgment is hereby entered in favor of plaintiffs, Matthew S. Bronson, by Thomas M. Bronson, Jr., and Deborah J. Bronson, his parents and legal guardians, in the sum of $6,500,000.00 and in favor of Thomas M. Bronson, individually, in the sum of $420,669.32 against defendants, Horace Ricky Umphries, as administrator of the estate of Nicholas L. Umphries, deceased, and Horace Ricky Umphries, individually.

2. Upon the verdict of the jury, judgment is hereby entered in favor of defendant, Norfolk Southern Railway Company.[4]

All plaintiffs filed motions for new trial, which pursuant to Tenn. R. App. P. 3(e) specifically mentioned each of the issues raised on appeal. These motions for new trial were subsequently denied by order dated May 14, 2002. The Umphries, Bronsons and Schriers have all appealed from the Judgment of the trial court.

The Umphries, Bronsons and Schriers raise the following issues, concerning that portion of the Judgment exonerating NSR[5]:

I. The trial court erred in admitting into evidence the meggering test results, which were performed by the railroad on February 11, 14 and March 6, 1999, for the following reasons:

A. During their "testing" of the railroad cables on February 11, 1999, the railroad cut and removed track wiring and "Bootlegs," which permanently altered and changed the track wire

---

[4] A Judgment on Jury Verdict was also entered in the Schrier case against NSR on January 25, 2002. The Judgment reflected the jury's finding that NSR was not at fault and entered judgment in favor of NSR.

[5] For clarification, this Court's use of the term "Appellants" when discussing these issues includes all three original plaintiffs groups: (1) Paul A. Schrier, individually and David "Skip" Schrier; (2) Thomas M. Bronson, Jr., Deborah J. Bronson, and Matthew M. Bronson; (3) Horace Ricky Umphries, as Administrator of the Estate of Nicholas L. Umphries, deceased, Horace Ricky Umphries, Individually, and Julia Ann Umphries.

circuit causing their test results to be untrustworthy and inherently unreliable.

   B.  The testing conditions present on February 11, 14 and March 6, 1999 did not duplicate or exemplify the conditions existing at the time of the subject accident.

   C.  The doctrine of spoliation precludes admission of the railroad's test results.

   D.  The railroad employees who performed the tests did not have the requisite experience, knowledge, education or training needed in order to perform such tests.

   E.  The inherent unreliability of the manner and methodology of the railroad's testing and of the means by which the test results were recorded precludes admission of the test results.

   II.  The trial court erred in refusing to instruct the jury regarding the provisions of C.F.R. §234.241 and in refusing to instruct the jury that violation of C.F.R. §234.241 constitutes negligence *per se*.

   III.  The trial court erred in refusing to instruct the jury regarding the provisions of C.F.R. §234.267 and in refusing to instruct the jury that violations of C.F.R. §234.267 constitutes negligence *per se*.

   IV.  The trial court erred in excluding the complete film or motion picture demonstration of the signal crossing flashers.

The Umphries raise the following additional issue for our review, concerning that portion of the Judgment awarding the Bronsons $6,920,669.32:

   The trial court erred in directing a verdict, *sua sponte*, in favor of Thomas A. Bronson, Jr. at the close of the proof based upon the family purpose automobile doctrine.

   We note at the outset that, in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; and in determining whether there is material evidence to support the verdict, the appellate court is

-5-

required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury. *Crabtree Masonry Co. v. C & R Const., Inc.*, 575 S.W.2d 4 (Tenn. 1978).

### The trial court erred in admitting into evidence the meggering test results, which were performed by the railroad on February 11, 14 and March 6, 1999

As noted above, on November 15, 2001, Horace Ricky Umphries filed a Motion *in Limine* to Exclude Testing Performed by Norfolk Southern Railway Company. All Appellants contended that a short in, or damage to, the underground railroad cable caused a malfunction that prevented the red, flashing railroad crossing signal from timely activating. Appellants argue that, despite NSR's knowledge of Appellants' trial theory, NSR performed various destructive tests and experiments on the buried track wires at the accident scene during the first trial on February 11 and 14, 1999 and March 6, 1999. By 1999, the Old Bailey Station crossing and its related warning lights were no longer in existence, having been replaced in 1995 (after the accident at issue) by the New Bailey Station Road, which is located some 300 feet to the west of the old crossing. All three pairs (transmit, receive, and check) of the old track wires remained buried in the ground, beginning in the east where the equipment shelter had been, and running west 600 feet to where they had been connected to the rails before the crossing closed.

Outside the presence of the jury, the trial court heard evidence from Messrs. Gary Lett and R.G. Lewallen[6] concerning NSR's testing. Following this testimony, the trial court ruled that the results of the meggering tests were admissible.[7] The trial court stated, in relevant part, as follows:

> ...Mr. Lett...is strictly as I understand it a fact witness. He's not offering an opinion as such. He's just telling us what he did. I may hear experts later on that tell me he didn't do it right or what he did doesn't constitute a proper meggering or whatever, but he's telling us factually what happened.

---

[6] Mr. Lewallen was the communications and signals general supervisor for Tennessee at the time of the accident. Mr. Lett was the communications and signals supervisor for Memphis. Mr. Lett testified that he was the person who actually performed the testing on the spliced sections of wire, which were removed on February 11, 1999 and March 6, 1999.

[7] A meggering test measures the value of the insulation resistance on a multi-conductor cable. A "megger" device is used to take the measurement. The user attaches two leads to the ends of the cable he or she wants to test, then turns the crank on the "megger" device and reads the dial.

As far as the exclusion of any test that was done, my opinion is that it wouldn't be excluded....

\*                                    \*                                    \*

...I think, though, that it [questions put to Mr. Lett] goes more to what happened, how it happened, what's the result of it happening than it goes to the exclusion. I mean, I think we've got to let the jury hear the fact that the railroad went out there on February 11th, February 14th and March the 6th.... I think all the questions you [Mr. Richardson, attorney for the Umphries] asked Mr. Lett when you were cross-examining as I recall them were all right to challenge what he was saying and why his background and training, but I still think he's [Mr. Lett] a fact witness.

We find that the majority of Appellants' issues regarding the admissibility of NSR's test results revolve around issues of fact and/or credibility of witnesses and, as such, should correctly have been put to the jury. We now address each of Appellants' concerns in turn.

We first note that the trial court is afforded wide discretion in the admission or rejection of evidence, and the trial court's action will be reversed on appeal only when there is a showing of an abuse of discretion. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439 (Tenn. 1992); *Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995). The abuse of discretion standard requires us to consider: (1) whether the decision has a sufficient evidentiary foundation; (2) whether the trial court correctly identified and properly applied the appropriate legal principles; and (3) whether the decision is within the range of acceptable alternatives. *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000). While we will set aside a discretionary decision if it does not rest on an adequate evidentiary foundation or if it is contrary to the governing law, we will not substitute our judgment for that of the trial court merely because we might have chosen another alternative.

### Removal of Track Wire and "Bootlegs"

Gary Lett testified that the tests performed in 1999 were made for the following purpose:

Q. What were you [Mr. Lett] asked to do and by whom?

A. I was asked by the general supervisor R.G. Lew[allen] out of Knoxville to expose track wire at the site at the shelter at the Old Bailey Station Road crossing and then expose the cables beyond the new–west of the New Bailey Station Road and to megger those cables and to record the results.

       *          *          *

> Q. Were you told how far west to go before you did the meggering, how far west of the new road?
>
> A. Not any specific distance, just as long as we were west of the road where we exposed the cables.

Mr. Lett provided further testimony, which outlined how he went about locating the wires that were to be checked. Mr. Lett testified that he unearthed the wires at the east where the old equipment shelter stood and at the west where the wires originally connected to the rails. To unearth wires at the rails where they were connected to the track, Mr. Lett testified that he had to dig through the rock ballast of the railroad bed. In digging through the rock ballast, Mr. Lett testified that he was only able to uncover two pairs of wires (as opposed to the three pairs that actually existed).[8] Still working on the west side of the new road, Mr. Lett traced the wires back to a shallow ditch and was able to unearth all three pairs at that location. Having found all three pairs of wires, Mr. Lett testified that he was able to perform his tests on the segment of the wires that ran under the New Bailey Station Road.

In order to perform the megger test on the wires, Mr. Lett made a cut in each wire to expose an end to which he could attach the meggering device. During this process, Mr. Lett testified that he discovered a splice in both transmit wires at the ditch where he unearthed them. The splices were located inside a piece of PVC pipe. Mr. Lett cut out the approximately 3-foot segment of the wire that contained the splices.[9] Mr. Lett testified that he meggered the wire after removing this segment; however, there is some dispute as to whether these wires were meggered prior to removal of the spliced sections. On March 6, 1999, in the presence of Appellants' attorneys, a second splice was found in both check wires. Another 3-foot section, containing that splice, was then removed.[10]

---

[8] Before tracing these wires from the track to the ditch, Mr. Lett testified that he performed a megger test of the wires that he found at the track connection. Using the results of this test, Mr. Lett was able to identify these same wires when they were unearthed in the ditch:

> Q. How did you determine which pair was which?
>
> A. The transmit pair at the track I knew meggered infinity. The check pair I knew meggered four megohms to ground. Whenever I came over and pulled these wires out and cut these wires, I meggered these pair–this pair of wires again, and I still had four megohms, so I was certain or pretty certain at that time that was the check pair...

[9] This section of wire was introduced into evidence as Trial Exhibit 26.

[10] This section of wire was introduced into evidence as Trial Exhibit 27.

Concerning the removal of track wire, Appellants contend that Mr. Lett's meggering tests specifically excluded a 60 to 70 foot stretch of receiver wire, which connected the wire from the track to the ditch:

> Q. Now, isn't it true that you did not megger at all the receive wire up near the track to the point where you cut it in the ditch?
>
> A. Correct.
>
> Q. And that section would be about how long?
>
> A. Fifty–probably 60 or 70 feet.
>
> Q. Okay. And isn't it true that the motion sensor detectors were disconnected when you went out there?
>
> A. Yes. There was nothing out–there was no equipment on these cable.

There is dispute in the record as to the effect of the removal of these spliced sections on the validity of the meggering tests performed by Mr. Lett. Specifically, Appellants are concerned with whether Mr. Lett performed meggering tests on these sections of the wires and, if he did perform those test, did he do so prior to removing the spliced sections or after. We find that these issues go to the weight of the evidence and not to its admissibility. Appellants' attorneys had ample opportunity, and did indeed, refute Mr. Lett's testimony concerning the validity of these tests and the reliability of same. The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

In their briefs, Appellants also complain of the removal of other wire portions (aside from the spliced sections discussed *supra*). First, the Appellants argue that "Lett removed a four or five foot segment of cables at the island shelter." Appellants cite the following section of the trial transcript in support of their contention that Mr. Lett removed portions of the island shelter wires:

> Q. And then up near the island shelter where it had been and you found the cables there, they were buried; correct?
>
> A. Yes.
>
> Q. And they were cut; correct?

A.  Yes, sir.

From this section of the transcript, Appellants would have us draw the inference that it was Mr. Lett who cut those wires at the island shelter when he was out to do the testing on February 11, 1999.  We have reviewed the relevant sections of the entire trial transcript and we find that Mr. Lett did not remove portions of the wires from the island shelter; rather, those portions of wire were removed when the Old Bailey Station crossing was closed in 1996:

> Q.  On February 11[th] when any testing was done by Mr. Lett, there was no connections of any of this track wire to the rail; correct?
>
> A.  That is correct.
>
> Q.  That had been removed?
>
> A.  Yes, the crossing had been closed and relocated in June of '96.
>
> Q.  Okay.
>
> A.  So those track connections were disconnected from the track.
>
> Q.  Yes, sir.  And then the island shelter would have been right here and the connections between the island shelters, the motion sensor therein, was disconnected.  They were no longer in existence; right?

Again, the issue of whether and by whom sections of the island shelter wires were removed and what, if any, effect that removal had on the validity of Mr. Lett's testing, goes to the weight and not the admissibility of the evidence.

Appellants also complain of the removal of "bootlegs."  A bootleg is a short wire within a hose-like sleeve.  It is used to connect the end of the track wires to the rail.  Bootlegs are necessary because track wires are too rigid to connect directly to a rail.  The bootleg merely spans the distance from the end of the track wire, up through the railroad bed to the rail.  Mr. Lett testified that he was to perform tests on the track wire that ran under the new road.  While Mr. Lett testified that he dug into the ballast down to the bootleg, which he followed to the track wire, cutting the track wire past the bootleg so that he could megger it, we find nothing in the record to support the Appellants' contention that the bootlegs were actually removed from the ground.  The Appellants had the opportunity to present evidence concerning the bootlegs and whether disturbing the bootlegs affected the validity of Mr. Lett's tests.  But, again, this is an issue of weight and not admissibility, which was properly put to the jury.

**Testing conditions**

Appellants contend that, at the time of the accident on January 14, 1995, the area near the crossing was saturated with water due to heavy rainfall. Appellants argue that "at the time of the Railroad's testing on February 11, 14 and March 6, 1999, the conditions were dry and did not mirror the conditions existing at the time of the accident." We cannot agree. Photographs taken at the time of the testing, specifically Trial Exhibits 95 A & B, 96 A, 97 A & B, and 99 A & B, clearly show standing water in the ditch where the splices were found. Mr. Lett's testimony supports the fact that water was, indeed, present at the time of the testing:

> Q. Did you [Mr. Lett] find anything unusual when you started doing–
>
> A. Yes, I did. When we dug into the ditch–there was water in the ditch, also, so we dug somewhat down below and tried to get the water away from [the wires]...

The evidence simply does not support Appellants' argument that the weather conditions at the testing were substantially different from those existing at the time of the accident. Therefore, the trial court did not err in not excluding this evidence on the basis of differing weather conditions.

Appellants also contend that, because of Mr. Lett's removal of sections of track wire, the conditions were not similar to those at the time of testing. We find that Appellants had the opportunity, and did, cross-examine NSR's witnesses on these alleged flaws in the testing, including the perceived problem with removal of track wire and the subsequent change in conditions at the site.

### Spoliation of Evidence

Appellants' spoliation argument is premised on their contention that NSR conducted testing at the scene of the accident, during the first trial, without giving notice to any of the other parties involved in the litigation, and without taking any measures to protect the scene. Appellants assert that NSR's bad faith can be properly inferred from these actions. We do not agree. The doctrine of spoliation of evidence permits a court to draw a negative inference against a party that has intentionally, and for an improper purpose, destroyed, mutilated, lost, altered, or concealed evidence. See *Foley v. St. Thomas Hosp*., 906 S.W.2d 448, 453-54 (Tenn.Ct.App.1995) (cited in *Eady v. Cigna Prop. & Cas. Companies*, No. M1998-00524-SC-WCMCV, 1999 WL 1253092, at *2 (Tenn. Dec. 27, 1999)); *See also Thurman-Bryant Elec. Supply Co ., Inc. v. Unisys Corp., Inc.*, No. 03A01-CV00152, 1991 WL 222256, at *5 (Tenn.Ct.App. Nov. 4, 1991).

From our reading, this record is devoid of any facts or evidence to suggest that NSR intentionally destroyed, lost, or concealed evidence for the improper purpose of keeping it from the court. In fact, there is dispute in the record as to whether the evidence was actually "destroyed, mutilated, lost, [or] altered" to such an extent that the Appellants could not conduct

their own testing. NSR contends that the two sections of spliced wire, which were actually removed by Mr. Lett, could still be tested by either side. We find nothing in the record to show that Appellants ever attempted to conduct their own tests on these wires, or on the track wires that remained undisturbed at the site. What the record does show is that Appellants' counsel watched in person on March 6, 1999 as NSR personnel performed the February 11, 1999 tests again. To find that the tests results should now be excluded on the basis of spoliation requires more conjecture than the record supports.

### Experience, knowledge, education or training of the testing personnel

Pursuant to Rules 702 and 703 of the Tennessee Rules of Evidence, Appellants contend that the NSR employees who performed the tests lacked adequate qualifications. We note that Rules 702 and 703 of the Tennessee Rules of Evidence deal specifically with qualification of experts. Messrs. Gary Lett, R.G. Lewallen, and Phil Myers were the NSR employees who performed or supervised the tests on February 11, and 14, 1999 and March 6, 1999. As correctly pointed out by NSR in its brief, NSR never attempted to qualify any of these witnesses as experts.

Appellants' brief cites several perceived problems with how Mr. Lett conducted the meggering test, to wit: (1) "Lett did not know which wire was check, receive or transmit when he performed the meggering testing of the railroad cable on February 11, 1999;" (2) "Lett did not locate the receive wire at the 600 foot signal and did not perform a meggering test of the receive wire at the 600 foot signal;" (3) "Lett 'cut out' the splice and then performed a meggering test of the wire." Appellants also point to Mr. Lett's alleged lack of knowledge, to wit: (1) Lett had only performed meggering testing on **one** prior occassion;" (2) "Lett had **never** used that particular meggering machine before;" (3) "[p]rior to February 11, 1999, Lett had only performed one other meggering test for the Railroad wherein Lett used an entirely different piece of meggering equipment; (4) "Lett had never been to any school to receive training in using this piece of meggering equipment." Despite Appellants' contentions, the fact remains that NSR never attempted to call Mr. Lett as an expert witness. In fact, the trial court correctly pointed out that "he's [Gary Lett] a fact witness." From our reading of the entire record, we find that the testing personnel testified about what happened on the day of the tests based on their personal knowledge and observations. Any contention on the part of Appellants concerning the observations made by these witnesses or their perceived lack of knowledge and training were relevant only to the weight of the evidence and the credibility of the witness. However, since there was no attempt to qualify these witnesses as experts, their alleged lack of knowledge and qualifications do not affect the admissibility of their testimony.

### Unreliability of the means by which the test results were recorded

Appellants argue that the test results obtained on February 11, 14, and March 6, 1999 should have been excluded by the trial court because the test results, as reported at trial by Gary Lett, were unreliable. Appellants base this contention on their assertion that Gary Lett dramatically changed his prior sworn testimony concerning the results of the meggering test.

Specifically, Lett's testimony that he performed a meggering test of the check wire at the scene in February 1999, that he obtained a reading of 10 megohms when he tested the check wires to each other, and that he obtained a reading of 4 megohms when he tested the check wire to the ground, is in direct conflict with his deposition, his voir dire testimony to the court outside the presence of the jury, and to his field notes. In each of these, Appellants contend that Mr. Lett testified that he did not test the check wires to ground. Appellants assert that this change in testimony makes the test results inherently unreliable and, therefore, inadmissible. We disagree. Mr. Lett's alleged change in testimony goes directly to his credibility as a witness and not to the admissibility of the test results. We note that Appellants had the opportunity, and did, question Mr. Lett concerning his changed testimony:

> Q. And then when you told us when we asked you the same questions under oath in your depositions, you also mentioned the same readings?
>
> A. Using my notes as a reference, yes sir, I did.
>
> *                                  *                                  *
>
> Q. And then, likewise, when you testified about a month ago or less than a month ago on this stand, you also said the same thing, didn't you?
>
> A. Yes, I did.
>
> Q. So, now, what is your explanation for not writing down that you megged the check wires to ground, that you'd missed writing that down in your notes the day of February 11th, that you missed telling us under oath in February '99 about that, that you missed telling the Judge under oath less than a month ago about that, and now you're in front of the jury, the third time under oath, now giving new different information?
>
> A. To err is human is the only explanation I have...

The above testimony indicates that the Appellants called Mr. Lett's credibility into question. Whether to believe the validity of the tests Mr. Lett performed was then, rightly, left in the hands of the jury who were in the best position to observe the witness in his manner and demeanor while testifying. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). It is well settled that the weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See id.*; *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

We will now address Appellants' issues concerning jury instructions together. Appellants contend that the trial court erred in refusing to instruct the jury regarding the provisions of 49 C.F.R. §234.241 and in refusing to instruct the jury that violation of 49 C.F.R. §234.241 constitutes negligence *per se*. 49 C.F.R. §234.241 provides as follows:

> Insulated wire shall be protected from mechanical injury. The insulation shall not be punctured for test purposes. A splice in underground wire shall have insulation resistance at least equal to that of the wire splice.[11]

Appellants also assert that the trial court erred in refusing to charge the jury concerning the substance of 49 C.F.R. §234.267, which provides as follows:

> (a) Insulation resistance tests shall be made when wires or cables are installed and at least once every ten years thereafter.
>
> (b) Insulation resistance tests shall be made between all conductors and ground, between conductors in each multiple conductor cable, and between conductors in trunking. Insulation resistance tests shall be performed when wires, cables, and insulation are dry.
>
> (c) Subject to paragraph (d) of this section, when insulation resistance of wire or cable is found to be less than 500,000 ohms, prompt action shall be taken to repair or replace the defective wire or cable. Until such defective wire or cable is replaced, insulation resistance tests shall be made annually.
>
> (d) A circuit with a conductor having an insulation resistance of less than 200,000 ohms shall not be used.
>
> (e) Required insulation resistance testing that does not conform to the required testing schedule of this section shall be completed in accordance with the following schedule:
>
> > (1) Not less than 50% by the end of calendar year 1996;
> >
> > (2) Not less than a total of 75% by the end of calendar year 1997; and
> >
> > (3) One hundred percent by the end of calendar year 1998.

---

[11] A copy of 49 C.F.R. §234.241 was introduced at trial as Trial Exhibit 108.

It is a well settled rule that trial courts should give a requested jury instruction if it satisfies three requirements (1) it is supported by the evidence, (2) it embodies the party's theory, (3) it is a correct statement of the law. *Hayes v. Gill*, 216 Tenn. 39, 390 S.W.2d 213, 214 (Tenn.1965); *Strickland v. City of Lawrenceburg*, 611 S.W.2d 832, 837 (Tenn.Ct.App.1980); *Tallent v. Fox*, 24 Tenn.App. 96, 141 S.W.2d 485, 497 (Tenn.Ct.App.1940).

Appellants argue that the jury instruction based on 49 C.F.R. §234.241 should have been given because their expert, Paul Gouty, gave *voir dire* testimony as follows:

> Q. And you [Mr. Gouty] say there's no Federal Railway Administration regulation governing splicing of insulated wires?
>
> A. That's correct.
>
> Q. Well, let me show you the FRA and see if you are sure about that...
>
>     *                     *                 *
>
> Q. I have got a sticky, yellow sticky, Mr. Gouty, for regulation 234.241 of Title 49 of the Code. If you will look at that for me, please and read that to yourself if you like?
>
> A. Which one is it?
>
> Q. 234.241. I did get it right. I got it right. And read that to yourself and tell me if that changes your mind as to whether or not there is a regulation by the FRA governing splices where we're talking about insulated wire?
>
> A. I'd like to read this aloud.
>
> Q. You may.
>
> A. [Mr. Gouty reads 49 C.F.R. §234.241 aloud]
>
> Q. Okay. And so are you now reminded of the fact that there is an FRA regulation governing splices?
>
> A. Yes, I missed that one.

Q. And are you able to tell this Court whether or not the splice that appears in each of those four wires that are Exhibits 26 and 27 fail to comply with the regulations you just read?

A. In my opinion, they do, sir.

Q. Why do they fail to comply with the regulation you just read?

A. Because in my experience over the years, we never were permitted on the railroad I worked for to make a splice underground by just wrapping it with electrical tape...

The trial court subsequently ruled that Mr. Gouty's opinion on the applicability of the statute was not admissible, to wit:

...I [the Court] did some research on the question of an expert testifying about a regulation or statute. There's a Tennessee case called Dempsey versus Correct Manufacturing Company, 755, S.W. 2d, 798. It's a 1988 case–I can't find where it's been overruled–which states that "the content, meaning and application of statutes and regulations are not a matter of fact to be proven by affidavit of expert witness but are matters of law to be presented by brief and argument of counsel supported by citations and authorities." It's a little different context than an expert in court but I think the meaning is pretty much the same as far as allowing an expert to testify about the content, meaning and application of statutes.

And the steps I plan to take–you can argue about it–is to disregard Mr. Gouty's testimony as to his opinion whether or not the railroad violated any regulations.

The trial court's determination that 49 C.F.R. §234.241 was not applicable in this case is a question of law. As such, our review is *de* novo on the record with no presumption of correctness accompanying the trial court's conclusions of law. ***See Tenn. R. App. P. 13(d);*** **waldron v. *Delffs, 988 S.W.2d 182, 184 (Tenn. Ct. App. 1998); Sims v. Stewart,** 973 S.W.2d 597, 599-600 (Tenn. Ct. App. 1998).

There is no dispute in the record that 49 C.F.R. §234.241 became effective on January 1, 1995. There is also no evidence in this record to suggest that the splices in question were made after January 1, 1995. In fact, the relevant evidence indicates that the splices were made prior to 1995. When cross-examined, R.G. Lewallen testified as follows concerning the splices:

Q. I think we're in agreement that something happened to these wires. They were either cut or damaged in some way that caused them to be spliced; that right?

A. Yes, sir. That's correct.

Q. If they were cut, wouldn't that make the signals activate improperly?

A. Yes, sir.

Q. And that would be considered a malfunction a failure of the system?

A. It would be classified as a false activation. The lights would be flashing.

Q. If someone cuts these wires and y'all had to go out and replace them, you would have had a false activation. Wouldn't you have had some record of that?

A. Depending on when it was done.

Q. I mean, are you telling us that the railroad doesn't keep records of activation failures and false activations?

A. We keep records for activation failures and false activations, but we did not start doing that until 1995, sir.

Since the record does not indicate that there was any record of an activation failure or false activation during the 15 day period between the effective date of 49 C.F.R. §234.241 and the date of the accident, the best inference that this Court can make is that the wires in question were not cut (and subsequently spliced) after 49 C.F.R. §234.241 went into effect. Consequently, two of the criteria for giving a special jury instruction concerning 49 C.F.R. §234.241 are not met, to wit: (1) the evidence in the case, as discussed *supra*, does not support a finding that 49 C.F.R. §234.241 was applicable under the facts of this case; and (2) since there is evidence to support an inference that the wires were damaged and spliced sometime prior to the effective date of 49 C.F.R. §234.241, it is not a correct statement of the applicable law. Having determined that 49 C.F.R. §234.241 was not applicable in this case, any issues or testimony involving the question of whether that statute was violated were irrelevant. The trial court was, therefore, correct in declining to give a special jury instruction concerning 49 C.F.R. §234.241.

-17-

Appellants also contend that the trial court's failure to charge the jury concerning the substance of 49 C.F.R. §234.267 unfairly prejudiced their case. This issue also involves a determination of whether 49 C.F.R. §234.267 was applicable at the time of the accident; and, as stated above, that determination was a matter of law, which we will review *de novo* with no presumption of correctness. A Federal Railroad Administration Memorandum dated December 14, 2001, and made part of the record as Trial Exhibit 198 reads, in pertinent part, as follows:

> Subject: Memorandum of understanding
>
> To: Mr. R.G. Lewallen
>     C&S General Supervisor
>     Norfolk Southern Corporation
>     Knoxville, Tennessee
>
> Dear Mr. Lewallen,
>
> This is in response to your request for clarification with regard to the application of 49 C.F.R. §234.267–Insulation resistance tests.
>
> The purpose of the insulation resistance test is to make sure that the insulating material used in underground cables is sufficient to prevent the possibility of grounding light wires or control wires which could cause the unwanted result of an activation failure or partial activation failure.
>
> First, please refer to rule 213 of this section 234, Grounds. This rule specifically excludes circuits of which track rails are included. Secondly, the wires that you are concerned with, track wires, are those which are excluded in this rule 213-Grounds. Finally, when making the required tests under rule 267, the test is to be made between the conductor and ground. It can be deduced that the track wires, being excluded in the other section, may also be excluded in the section covering insulation resistance as well. There should be no argument since the wire in its name is connected to the track and likewise is grounded by the track. The test for insulation resistance to ground would be unnecessary or irrelevant due to ultimately applying the wire to ground by attaching it to the grounded track. It has never been the intent of this agency to require insulation resistance tests on track wires.
>
> That being said, the Federal Railroad Administration does not require track wires to be tested for compliance with 49 C.F.R. §234.267–Insulation resistance test.

Sincerely,
Leon Horton /S/
S&TC Inspector
Lebanon, TN

Based upon this evidence alone, it is clear that 49 C.F.R. §234.267 does not apply to the track wires, which are at issue in this case. However, even if we allow, in the face of unrefuted evidence, that 49 C.F.R. §234.267 applies to track wires, there is still undisputed testimony in the record that the Old Bailey crossing came into service on February 1, 1985 and there is no evidence to suggest that the track wires were in place prior to that time:

> MR. RICHARDSON [counsel for the Umphries]: ...I will admit–well the meggering is in dispute so that's not a real genuine argument on the part of the railroad, but as far as the ten-year period, we've addressed it before and my only response is, Your, Honor, is I don't have evidence that the railroad constructed it before or that it went into service before February 1st of 1985.

The accident happened on January 15, 1995. Therefore, even if the regulation applied to track wires, NSR's duty under the statute would not have been triggered at the time of the accident. Consequently, the trial court did not err in refusing to give a special jury instruction concerning 49 C.F.R. §234.267.

## The trial court erred in excluding the complete film or motion picture demonstration of the signal crossing flashers.

In preparation for trial, the Umphries' attorney retained Stuart Nightenhelser, an accident reconstructionist, to film a simulation of the conditions affecting the visibility of the occupants of the Bronco on the night of the accident.[12] According to Mr. John Richardson, attorney for the Umphries, the only point of the film was to "show what a driver would see and what the occupants of the vehicle would see as they approached [the railroad crossing], beginning with the straightaway of approximately 600 feet back." Mr. Gibson, attorney for NSR, made the following objection to the admission of this film:

> MR. GIBSON: ...Now, there are five separate reasons I say it's not it's [the film] not a fair representation. First of all, you [the Court] will recall from the photographs [Trial Exhibits 1 through 21], there's

---

[12] At the time of the simulation, Old Bailey Road was no longer in use. Barricades had been placed in the road to keep vehicles from using it and a section of pavement had been removed near the approach to the crossing, leaving a gap that could not be traversed.

a yellow circle sign facing traffic going north.[13]  As a part of this recreation, for reasons I'm not able to understand, they went through a lot of elaborate detail, but they didn't put that [sign] back in place, and I think that's important.  Secondly–

THE COURT: You mean the yellow sign that's got the cross on it at the railroad?

MR. GIBSON: Yes, Your Honor.  Now, the second objection is there's no effort to show what a train would look like, there's no filming of a train approaching.  The third is, they ran runs–from the depositions, as I understand it–Mr. Richardson can correct me if I'm wrong–at velocities of 15 miles per hour, 20 miles per hour and 25 miles per hour, and the actual speed, according to all of the testimony we've heard to date, when they emerged from the tree line, was 10 miles per hour, so that's another–

THE COURT: What was your understanding of the speeds that came out of the tree line?

MR. GIBSON: 15, 20, and 25

THE COURT: Okay.

MR. GIBSON: The fourth one is, there are no runs where the headlights of the Bronco were on high beam.  At all times, they were on low beam or no lights at all, I think they said.  And then, fifthly, it's been established that there is–well, I don't know whether it's been established yet or not in this record, but we know from, at least, opening statements and the proof in the prior trial, there is short warning here, not a non-warning.  When the train entered into that second 600 foot circuit, warning lights were activated.  It was just a short warning.  That's the theory of the case that's been stated to the jury, and there is no occasion in this film when the lights come on in the last few seconds...

Following Mr. Gibson's objection, the trial court viewed the film and then voiced its primary concerns with allowing the film into evidence:

_____

[13] Mr. Gibson is referring to a standard-issue, yellow reflective sign used to warn motorist of an upcoming railroad crossing.

...As I [the Court] said on the front end, the main concern I have–I understand what it is you're [Mr. Richardson] trying to prove, but I've also seen what it is you want to show the jury. It's going to show a picture of the scene that doesn't reflect what happened on that night, and I think that the fact that there isn't a yellow marker, there's not a train approaching, there's not the lights coming on at the last second, those are the things that concern me most. The speed run concerns me because of the fact that all the testimony I've heard so far says that they were going five to ten when they came out from the tree line. The lights not being on high beam aren't as much of a concern, but those factors are really–

The trial court then allowed Mr. Richardson to further examine the experts, Messrs. Nightenhelser and Halstead (a railroad accident reconstructionist). The court then made the following, relevant statements in ruling to exclude the film:

...I've [the Court] still got the same problems I had before [additional testimony from the experts], in that I don't think that the film accurately depicts the conditions that existed at the time of the accident. Your [Mr. Richardson's] experts have explained why they did it the way they did it. I think it's in the record. If at some point, you want to attempt to get it in...or rehabilitate it, that's fine, but I'm not comfortable with the film that I've seen as depicting accurately the situation that existed at the time of the accident, and I think that you can't take a movie and say, "Look, jury, there's only one issue here. Just disregard the fact that the yellow marker is not there, disregard the fact that it doesn't show a train approaching, disregard the fact that it doesn't show anything about whether the lights did or didn't come on. We've made a run at certain speeds, and there were different speeds maybe that were testified to. Just disregard all that. The only thing we're trying to show is one thing." And I don't think you can pull that one thing out from the rest of the movie and show it to the jury...

    *                        *                        *

...I'm going to sustain the objection at this time without any prejudice for you to offer it again at some future time, but based on what I've

heard at this point, I don't think that it would be–I don't think that it is admissible.[14]

It is well settled that the trial court is afforded wide discretion in the admission or rejection of evidence, and the trial court's action will be reversed on appeal only when there is a showing of an abuse of discretion. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439 (Tenn. 1992); *Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995). From our review of the relevant portions of the record in this case, we find that the trial court's concerns with the simulation film were well taken. Consequently, it was not an abuse of discretion for the trial court to exclude the film from evidence.

### The trial court erred in directing a verdict, *sua sponte*, in favor of Thomas A. Bronson, Jr. At the close of the proof based upon the family purpose automobile doctrine

This issue arises out of the Bronsons' suit against Horace Ricky Umphries, father of Nicholas L. Umphries, under the family purpose automobile doctrine. Horace R. Umphries moved for directed verdict at the close of plaintiffs' proof and renewed the motion at the conclusion of all proof. The trial court then instructed the jury, in relevant part, as follows:

> In this case I found that Nicholas Umphries was driving a car furnished by his father for the general use, convenience, and pleasure of the family. This means that the father, Horace Ricky Umphries, is responsible for the fault, if any, of his son, Nicholas Umphries.

When deciding a motion for directed verdict, both the trial court and the reviewing court on appeal must look to all the evidence, take the strongest legitimate view of the evidence in favor of the opponent of the motion, and allow all reasonable inferences in favor of that party. The court must discard all countervailing evidence, and if there is then any dispute as to any material fact, or any doubt as to the conclusions to be drawn from the whole evidence, the motion must be denied. *See Conatser v. Clarksville Coca-Coal Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Hurley v. Tennessee Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. Ct. App. 1995).

Our Supreme Court has outlined the criteria for applicability of the family purpose automobile doctrine in *Camper v. Minor*, 915 S.W.2d 437, 447 (Tenn. 1997) as follows:

---

[14] We note that the attorneys were given the opportunity to argue the admissibility of this film later in the trial, outside the hearing of the jury. These further arguments did not sway the trial court that the film was admissible. Having read the additional arguments of counsel, we are nonetheless still in agreement with the trial court that the film was not an accurate depiction of the scene of the accident.

The family purpose doctrine is applicable when two requirements have been satisfied. First, the head of the household must maintain an automobile for the purpose of providing pleasure or comfort for his or her family. *Scates v. Sandefer*, 163 Tenn. 558, 44 S.W.2d 310 (1931). Second, the family purpose driver must have been using the motor vehicle at the time of the injury "in furtherance of that purpose with the permission, either expressed or implied, of the owner." *Redding*, 230 S.W.2d at 205. *See also Stephens v. Jones*, 710 S.W.2d 38 (Tenn.App.1984); *Long v. Tomlin*, 22 Tenn.App. 607, 125 S.W.2d 171 (1938).

The uncontroverted evidence concerning the applicability of the family purpose automobile doctrine came from the testimony of Horace Ricky Umphries and reads, in relevant part, as follows:

> Q. When it came time for Nick to start driving, were you [Horace Ricky Umphries] in a position that you could go out and buy Nick a vehicle to drive?
>
> A. Yes.
>
> Q. Did you give that vehicle to Nick?
>
> A. Didn't give it to him. We had a contract between each other, because I wanted to teach the value of responsibility, and so we had a contract that as long as he maintained his school academics, and if he was going to work a part-time job and be able to keep that up, that he would pay me back so much money a month for the vehicle, and then he'd also make sure he was responsible for the gas and the oil and that kind of thing.
>
> Q. And so you purposely–y'all had an agreement between y'all that he had to pay you back the full purchase price?
>
> A. Well, really, what I was doing was letting him pay me, but I was sticking it back in his account–savings account.

From this evidence, the Umphries claim that Mr. Umphries did not "maintain" the vehicle because Nicholas paid for gas and oil. The purpose of the family purpose automobile doctrine, as outlined by our Supreme Court in *King v. Smythe*, 204 S.W. 296 (Tenn. 1918), is as follows:

> If an instrumentality of this kind is placed in the hands of his family by a father, for the family's pleasure, comfort, and entertainment, the

-23-

dictates of natural justice should require that the owner should be responsible for its negligent operation, because only by doing so, as a general rule, can substantial justice be attained. A judgment for damages against an infant daughter or an infant son, or a son without support and without property, who is living as a member of the family, would be an empty form. The father, as owner of the automobile and as head of the family, can prescribe the conditions upon which it may be run upon the roads and streets, or he can forbid its use altogether. He must know the nature of the instrument and the probability that its negligent operation will produce injury and damage to others. We think the practical administration of justice between the parties is more the duty of the court than the preservation of some esoteric theory concerning the law of principal and agent. If owners of automobiles are made to understand that they will be held liable for injury to person and property occasioned by their negligent operation by infants or others who are financially irresponsible, they will doubtless exercise a greater degree of care in selecting those who are permitted to go upon the public streets with such dangerous instrumentalities.

In order to accomplish this purpose, a broader interpretation of "maintain" is necessary. Neither Nicholas' purchasing gas and oil for this vehicle nor the "contractual" arrangement that he had with his father change the fact that Horace Ricky Umphries purchased this Bronco and entrusted it to his son. The testimony of Horace Ricky Umphries, see *supra*, is the only evidence in the record concerning the Umphries' family arrangement when it came to the Bronco. We note that the record is devoid of any evidence concerning the registration or title of this vehicle.[15] From the uncontroverted testimony and evidence before us, we find that the trial court could only have reached the conclusion that it did–the family purpose automobile doctrine is applicable to this case.

We affirm the trial court's judgments on the jury verdicts. Costs of appeal are assessed one-third to Horace Ricky Umphries, and his surety, one-third to Thomas A. Bronson, Jr., and his surety, and one-third to Paul S. Schrier and David Schrier, and their sureties.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.

_____

[15] Although a copy of the title to the Bronco was attached to Horace Ricky Umphries' Affidavit, this evidence was never introduced at trial.