# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
January 8, 2015 Session Heard at Knoxville

## LEA ANN TATHAM v. BRIDGESTONE AMERICAS HOLDING, INC., ET AL.

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Madison County**
**No. C-09133     Donald H. Allen, Judge**

---

**No. W2013-02604-SC-R11-CV – Filed October 30, 2015**

---

This products liability case arises out of an accident which resulted from the failure of a tire purchased less than three months before the accident. As a result of the accident, the plaintiff's vehicle was totaled. Subsequently, the entire vehicle, including the tire, was destroyed. This case presents the following issues for review: (1) whether the trial court abused its discretion by refusing to dismiss this case as a sanction for spoliation of evidence; (2) whether the trial court erred in denying summary judgment to the Defendants on the issues of causation and whether the tire was defective or unreasonably dangerous; and (3) whether the trial court erred in denying summary judgment on the issue of the application of the apparent manufacturer doctrine. Upon a thorough review of the record and the applicable law, we conclude that the trial court did not err with respect to any of these issues. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 11 Appeal by Permission from Denial of Rule 9 Application;**
**Judgment of the Trial Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK, J., joined. GARY R. WADE, J., filed a separate opinion concurring in part and concurring in the judgment. HOLLY KIRBY, J., not participating.

Emily Turner Landry, Julia Kavanagh, and George T. Lewis, Memphis, Tennessee, for the appellants, Bridgestone Retail Operations, LLC and GITI Tire (USA) Ltd.

Donald D. Zuccarello, Jay W. Hicks, and Kimberly Stark, Nashville, Tennessee, for the appellee, Lea Ann Tatham.

## OPINION

## Factual and Procedural Background

This products liability suit, filed by Lea Ann Tatham ("the Plaintiff"), arises from the failure of an automobile tire ("the tire") sold by Bridgestone Retail Operations, LLC, and GITI Tire (USA) (collectively "the Defendants"). The manufacturer of the tire, GITI Tire (Hualin), a Chinese company, is not a party to the case.

According to the Plaintiff's affidavit and deposition taken in this case, the Plaintiff bought a 1996 Cadillac STS online from a private owner in 2007. On March 3, 2008, the Plaintiff bought two Primewell PS830 rear tires from Firestone Complete Auto Care in Murfreesboro, Tennessee. The Plaintiff stated that she chose those particular tires because they were "the best value." She could not recall whether the associate assisting her informed her about warranties associated with the tires.

The Plaintiff stated that she never checked the air pressure in her tires herself. She did not recall whether anyone else checked the air pressure in her tires in the three months following the tire purchase. She also did not recall "running over anything unusual in the road" or "hitting anything" with her vehicle during that time.

On May 30, 2008, the Plaintiff was involved in a single-vehicle accident. She was returning from a long trip on the interstate when one of the newly purchased tires failed. On the way home, she recalled stopping at a Popeyes in Memphis and for gas in Jackson, Tennessee. At the time that she reached Jackson, she was approximately six and a half hours into her eight-hour trip. She denied experiencing any problems with the vehicle prior to stopping for gas in Jackson. The Plaintiff did not recall seeing anything wrong with her tires when she stopped for gas, but she acknowledged that she did not intentionally look at the tires at that time.

The Plaintiff could not recall much about the circumstances immediately preceding the accident but stated that, shortly after leaving Jackson, she must have lost control of her vehicle because she remembered saying, "Oh, my God." The vehicle struck a guardrail, flipped, and finally landed in a ditch. She did not know how fast she had been driving but stated that she usually drove seventy miles per hour on that interstate.

Dr. Tammy Rogers, a witness to the accident, testified by deposition that she was riding in the passenger's seat of her vehicle while her son, Matt, was driving. She described the weather conditions on that day as "clear and sunny." Dr. Rogers then stated,

Matt was driving and we got on the interstate. And I'm driving with a 16-year-old. So in case anybody asks, yes, I was paying a lot of attention because I was letting a 16-year-old drive. So I was in the passenger seat, and we were just driving. And we got into the left-hand lane to pass someone because there was probably more traffic than normal, being a holiday weekend. And so we were going around somebody, and we got behind a car that had – we had been following them for a couple of miles because they were also passing the cars that were there, and we noticed something started kind of flapping underneath the car.

Dr. Rogers stated that the vehicle in front of them was "driving in a normal fashion" and never drove on the "rumble strips" on the shoulder. She continued, "Matt and I both noticed something that was black and seeming to flap underneath the car. So at that point, we kind of watched it for maybe 30 seconds to a minute, and I told Matt[,] . . . . [s]low down and back off and give that car some room." She described the "flapping" as being "on the inside part of the tire." She estimated that what she saw "flapping" was approximately four to six inches long.

Dr. Rogers testified that, a few seconds after telling Matt to slow down, "something came out from under the car." She compared the object to "pieces of tire you see on the side of the road when semis have blow-outs." She testified that, after the object came off of the vehicle,

> [t]he car started going towards the median and it appeared that the driver tried to correct. And when they corrected, the car spun out. And so it spun back. So it had gone to the – to the median first, and then it spun back across the interstate, hit the guardrail and flipped.

The Plaintiff confirmed that she was wearing her seatbelt at the time of the accident. The first thing she remembered after the accident was "[g]etting out of the car and checking on [her] daughter." As soon as she checked on her daughter, the Plaintiff suddenly realized that she had a lot of pain in her back, elbows, and knees. She denied that she was talking on her cell phone at the time of the accident. The Plaintiff could not recall any specific details about her vehicle after the accident or the accident scene.

Around the time that the Plaintiff checked on her daughter, a woman approached her and asked her if she was okay. This woman, later identified as Dr. Rogers, stayed with the Plaintiff until paramedics arrived. A wrecker service towed her vehicle from the scene and later informed the Plaintiff that her vehicle was totaled. At the advice of her insurance company, the Plaintiff transferred title of her vehicle, including the tire, to the wrecker

-3-

service.  According to the Plaintiff, at the time that she transferred title to the wrecker service, she had not yet hired an attorney and did not realize that the tire needed to be preserved.  As a result of the accident, the Plaintiff suffered a broken back, which forced her to stop working.

The Plaintiff filed her complaint against the Defendants on May 7, 2009, alleging that the tire was defective and/or unreasonably dangerous.  The Plaintiff claimed that she was entitled to relief based on grounds of strict liability, negligence, and breaches of implied warranty of fitness, implied warranty of merchantability, and duty to warn.

The Defendants moved for summary judgment, which the trial court denied.  Following discovery, the Defendants again moved for summary judgment and to have the case dismissed as a sanction for the spoliation of evidence.  The trial court denied the Defendants' second motion for summary judgment and their motion to dismiss.  However, the trial court granted the Defendants an interlocutory appeal.  The Defendants filed an application for permission to appeal with the Court of Appeals pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure.  The Court of Appeals denied the Defendants' application.

We granted the Defendants' application for permission to appeal to decide the following issues: (1) whether the trial court abused its discretion by refusing to dismiss this case as a sanction for spoliation of evidence; (2) whether the trial court erred in denying summary judgment to the Defendants on the issues of causation and whether the tire was defective or unreasonably dangerous; and (3) whether the trial court erred in denying summary judgment on the issue of the application of the apparent manufacturer doctrine.

## Analysis

### Spoliation of Evidence

The Defendants assert that the trial court abused its discretion by refusing to dismiss the case as a remedy for the spoliation of evidence pursuant to Rule 34A.02 of the Tennessee Rules of Civil Procedure.  Rule 34A.02 provides as follows:  "Rule 37 sanctions may be imposed upon a party or an agent of a party who discards, destroys, mutilates, alters, or conceals evidence."  Tenn. R. Civ. P. 34A.02.  In turn, Rule 37 gives a trial court the power to impose a range of sanctions for failure to comply with a discovery order, including: dismissal of the action, rendering a judgment by default, limiting the introduction of certain claims or evidence, entering an order designating that certain facts shall be taken as established, and striking out pleadings or parts of pleadings. See Tenn. R. Civ. P. 37.02(A)-(D).  In its Order declining to dismiss the case as a

sanction for the spoliation of the tire, the trial court reasoned, "[T]he Plaintiff did not intentionally participate in the destruction of such evidence following the accident in question. Therefore, the Defendant's request that the case be dismissed as a sanction for alleged spoliation of evidence is . . . denied."

The Defendants argue that "the trial court applied an incorrect legal standard in its analysis of the spoliation issue" because "the primary, if not the sole, factor leading to the trial court's decision not to impose sanctions for spoliation was the [trial] [c]ourt's determination that spoliation was not intentional." According to the Defendants, "[p]ursuant to Rule 34A.02 and the case law construing it, a finding that spoliation was intentional, fraudulent, or done with an intent to suppress the truth is not a necessary prerequisite" to a sanction. Therefore, the Defendants contend, in declining to dismiss the case, "the trial court abused its discretion . . . by placing improper weight on its finding that the [Plaintiff's] disposal of the tire was not 'intentional.'" In order to address whether intentional misconduct is a prerequisite to a sanction for the spoliation of evidence pursuant to Rule 34A.02, we first must look to the development of the law in Tennessee governing spoliation.

*Common Law / Inherent Authority*

Tennessee courts long have applied a prerequisite of intentional misconduct in the context of the spoliation of evidence.[1] This prerequisite originated with the common law "doctrine of spoliation," which allowed a trial court to draw a negative inference against a party who destroys evidence.[2] See Clark Const. Grp., Inc. v. City of Memphis, 229 F.R.D. 131, 139 (W.D. Tenn. 2005); Thurman-Bryant Elec. Supply Co. v. Unisys Corp., No. 03A01-CV00152, 1991 WL 222256, at *5 (Tenn. Ct. App. Nov. 4, 1991).[3] Under the

---

[1] As an initial matter, we note that the spoliation of evidence in a civil context is separate and distinct from this Court's analysis of "bad faith" and the State's duty to preserve evidence in the criminal context, which depends on factors unique to the criminal context such as the discovery of potentially exculpatory evidence and a criminal defendant's fundamental right to a fair trial. See State v. Merriman, 410 S.W.3d 779, 784-85 (Tenn. 2013); State v. Ferguson, 2 S.W.3d 912, 915-16 (Tenn. 1999).

[2] The doctrine of spoliation relates back to the famous English case of Armory v. Delamirie, in which the court announced the well-known legal maxim that "all things are presumed against a spoliator." 93 Eng. Rep. 664 (K.B. 1722); see also Virginia L. H. Nesbitt, A Thoughtless Act of a Single Day: Should Tennessee Recognize Spoliation of Evidence as an Independent Tort?, 37 U. Mem. L. Rev. 555, 558-59 (2007) (discussing the history of the doctrine of spoliation).

[3] The negative inference underlying the doctrine of spoliation is similar to the negative inference imposed under the related "missing witness" or "missing evidence" rules recognized in Tennessee. See State v. Jones, 598 S.W.2d 209, 224 (Tenn. 1980); Richardson v. Miller, 44 S.W.3d 1, 26-28 (Tenn. Ct.

doctrine of spoliation, a trial court may draw a negative inference only where the spoliating party "has *intentionally, and for an improper purpose*, destroyed, mutilated, lost, altered, or concealed evidence." Bronson v. Umphries, 138 S.W.3d 844, 854 (Tenn. Ct. App. 2003) (emphasis added) (citing Foley v. St. Thomas Hosp., 906 S.W.2d 448, 453-54 (Tenn. Ct. App. 1995); Thurman-Bryant, 1991 WL 222256, at *5); see also McLean v. Bourget's Bike Works, Inc., No. M2003-01944-COA-R3-CV, 2005 WL 2493479, at *4 (Tenn. Ct. App. Oct. 7, 2005); Leatherwood v. Wadley, 121 S.W.3d 682, 703 (Tenn. Ct. App. 2003).

The doctrine of spoliation, and therefore the prerequisite of intentional misconduct that accompanies it, first was recognized in Tennessee in the Court of Appeals' opinion in Thurman-Bryant, 1991 WL 222256, at *5. Finding "no authority directly [on] point in this jurisdiction regarding spoliation of evidence," the Court of Appeals in Thurman-Bryant cited with approval the following rule:

> It is a general rule that the intentional spoliation or destruction of evidence relevant to a case raises a presumption, or, more properly, an inference, that the evidence would have been unfavorable to the cause of the spoliator. Such a presumption or inference arises, however, only where the spoliation or destruction was intentional, and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent. Furthermore, any presumption that may arise from the spoliation or destruction of evidence is not conclusive, but rather is rebuttable, the spoliation of evidence being a circumstance open to explanation.

1991 WL 222256, at *5 (quoting 29 Am. Jur. 2d., Evidence § 244).[4]

---

App. 2000). Under the missing evidence/witness rule, when a party fails to introduce either an available witness or a piece of evidence which was in that party's possession and which would be "capable of shedding light on a material contested issue," a trial court may impose a negative inference that the missing evidence or witness "would have been unfavorable to the party possessing it." Richardson, 44 S.W.3d at 27-28; see also Jones, 598 S.W.2d at 224. Notably, the missing evidence/witness rule differs from the doctrine of spoliation in that it applies not to evidence which has been destroyed, but to evidence which the offending party *could have* produced but failed to do so. Richardson, 44 S.W.3d at 27.

[4] The current version of this language now can be found at 29 American Jurisprudence 2d Evidence section 256.

This negative inference under the doctrine of spoliation serves two purposes: "(1) it attempts to place the non-spoliator in a position similar to where it would have been prior to the destruction of evidence; [and] (2) it imposes a punitive effect on the spoliating party." Flottman v. Hickman Cnty., No. 3:09-0770, 2010 WL 4537911, at *1 (M.D. Tenn. Nov. 3, 2010) (citing Clark Const. Grp., 229 F.R.D at 139). Since Thurman-Bryant, the Court of Appeals repeatedly has emphasized that such negative inference may be drawn only where "the spoliation occurs in circumstances indicating fraud and a desire to suppress the truth" but not where "the destruction was a matter of routine with no fraudulent intent." McLean, 2005 WL 2493479, at *4 (holding that the trial court erred in drawing a negative inference against the spoliating party where there was no evidence of intentional misconduct); see also Fuller v. City of Memphis, No. W2011-02300-COA-R3-CV, 2012 WL 3201937, at *5 (Tenn. Ct. App. Aug. 8, 2012) (holding that the trial court did not err in refusing to draw a negative inference where there was no evidence of intentional misconduct); Smartt v. NHC Healthcare/McMinnville, LLC, No. M2007-02026-COA-R3-CV, 2009 WL 482475, at *17-18 (Tenn. Ct. App. Feb. 24, 2009) (affirming a jury instruction on the doctrine of spoliation and establishing a negative inference only for intentional misconduct); Smith v. State, No. E2004-0737-COA-R3-CV, 2005 WL 589818, at *9-10 (Tenn. Ct. App. Mar. 14, 2005) (no negative inference was appropriate where there was no evidence that the spoliation was due to intentional misconduct); Leatherwood, 121 S.W.3d at 703 (affirming trial court's decision not to apply a negative inference where there was no evidence of intentional misconduct).

Although the prerequisite of intentional misconduct originated with the common law doctrine of spoliation and only applied to the specific sanction of a negative inference, several panels of the Court of Appeals also have applied the requirement of intentional misconduct as a prerequisite to the imposition of sanctions *other than* that of a negative inference, such as dismissal of the spoliating party's cause of action or limiting the introduction of evidence. See Bellsouth Adver. & Publ'g Corp. v. Abebe, No. M2010-01020-COA-R3-CV, 2011 WL 1642478, at *4 (Tenn. Ct. App. Apr. 28, 2011) (declining to apply sanction of dismissal based on doctrine of spoliation where there was no evidence of intentional misconduct); Hensley v. Duke, No. E2009-00482-COA-R3-CV, 2010 WL 845385, at *9 (Tenn. Ct. App. Mar. 10, 2010) (holding that an award of damages should not be "reversed under the doctrine of spoliation of evidence" because there was no evidence of intentional misconduct); Bronson, 138 S.W.3d at 855 (holding under the doctrine of spoliation that certain evidence should not be excluded because there was no evidence of intentional misconduct). In short, the Court of Appeals on numerous occasions has expanded the prerequisite of intentional misconduct outside the specific sanction of a negative inference to apply as a prerequisite to a trial court's power to impose sanctions of any type for spoliation generally.

In contrast, irrespective of the doctrine of spoliation, Tennessee courts also have long maintained that trial courts have broad discretion in imposing procedural sanctions in order to preserve the integrity of the discovery process. See Mercer v. Vanderbilt Univ., Inc., 134 S.W.3d 121, 133 (Tenn. 2004) ("[T]rial judges have the authority to take such action as is necessary to prevent discovery abuse."); Lyle v. Exxon Corp., 746 S.W.2d 694, 699 (Tenn. 1988) ("[T]he inherent power of trial judges permits the trial judge to take appropriate corrective action against a party for discovery abuse."); Alexander v. Jackson Radiology Assocs., P.A., 156 S.W.3d 11, 13-16 (Tenn. Ct. App. 2004) ("[T]rial courts possess the inherent authority to take actions to prevent abuse of the discovery process.") (citing Mercer, 134 S.W.3d at 133); Clark Const. Grp., 229 F.R.D. at 140 ("[T]he Tennessee Supreme Court stresses that the trial court should have wide discretion to impose the appropriate sanction [to prevent discovery abuse]."). This authority does not arise from the common law doctrine of spoliation but, instead, is rooted in the trial court's inherent power to ensure the proper administration of justice. See Lyle, 746 S.W.2d at 699 (noting the "inherent power of trial judges"); Alexander, 156 S.W.3d at 13-16 (recognizing the trial court's "inherent authority").[5]

In Mercer v. Vanderbilt University, Inc., this Court considered whether exclusion of a witness' testimony was an appropriate sanction where the defendant failed to supplement its response to an interrogatory regarding the identity of expert witnesses expected to testify. 134 S.W.3d at 133. In Mercer, this Court stated:

> Although the Tennessee Rules of Civil Procedure do not provide a sanction for abuse of the discovery process, trial judges have the authority to take such action as is necessary to prevent discovery abuse. Lyle v. Exxon Corp., 746 S.W.2d 694, 699 (Tenn. 1988); Strickland v. Strickland, 618 S.W.2d 496, 501 (Tenn. Ct. App. 1981). Trial courts have wide discretion to determine the appropriate sanction to be imposed. Strickland, 618 S.W.2d at 501. Such discretionary decision will be set aside on appeal only when "the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence." White v. Vanderbilt Univ., 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999) (citing Overstreet v. Shoney's, Inc., 4 S.W.3d 694, 709 (Tenn.

---

[5]    This inherent power of trial courts to impose sanctions to prevent abuses of the discovery process is widely recognized by other state and federal jurisdictions. E.g., R.C. Olmstead, Inc., v. CU Interface, LLC, 606 F.3d 262, 273 (6th Cir. 2010); Stevenson v. Union Pac. R.R. Co., 354 F.3d 739, 745 (8th Cir. 2004); Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001); Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994); Aloi v. Union Pac. R.R. Corp., 129 P.3d 999, 1002 (Colo. 2006) (en banc); Richardson v. Sport Shinko, 880 P.2d 169, 182 (Haw. 1994) Patton v. Newmar Corp., 538 N.W.2d 116, 119 (Minn. 1995); Trevino v. Ortega, 969 S.W.2d 950, 959 (Tex. 1998).

Ct. App. 1999)). Appellate courts should allow discretionary decisions to stand even though reasonable judicial minds can differ concerning their soundness. White, 21 S.W.3d at 223; Overstreet, 4 S.W.3d at 709.

Id. Based on that reasoning, this Court in Mercer held "that the trial court acted within its discretion by excluding the testimony" when the trial court found that allowing the expert testimony would be highly prejudicial to the opposing party who was without appropriate time to prepare for it. Id.

The wide discretion recognized in Mercer also has been applied within the context of the spoliation of evidence outside the specific confines of a negative inference based on the common law doctrine. For example, in Gross v. McKenna, the plaintiffs brought suit against a home builder arising out of the allegedly negligent and partial construction of a home which the plaintiffs had demolished in order to continue reconstruction with another builder. No. E2005-02488-COA-R3-CV, 2007 WL 3171155, at *2 (Tenn. Ct. App. Oct. 30, 2007). There, the Court of Appeals noted that trial courts have "wide discretion in imposing sanctions against parties who destroy evidence" and that such discretion "necessarily implies that the factual circumstances of the case are crucial" to the trial court's determination of whether to impose such sanctions. Id. at *7 (citing Thurman-Bryant, 1991 WL 222256, at *5). Accordingly, the Court of Appeals held that the trial court did not abuse its discretion in declining to impose sanctions for the spoliation of evidence because there was no evidence that the demolition was performed in bad faith and because the defendant could make no "actual demonstration of prejudice" resulting from the demolition of the home. Id. at *10.

In Alexander v. Jackson Radiology Associates, P.A., the trial court granted the defendant's motion to dismiss as a sanction against the plaintiff for intentionally destroying a piece of evidence. 156 S.W.3d at 13-16. The Court of Appeals reasoned that, "although the [Tennessee] Rules [of Civil Procedure] do not explicitly provide for sanctions for discovery abuse absent a court order,[6] trial courts possess the inherent authority to take actions to prevent abuse of the discovery process," and that "wide discretion is afforded to the trial courts to determine the appropriate sanction." Id. at 15 (citing Mercer, 134 S.W.3d at 133) (noting that "the inherent powers of the court must be exercised with both restraint and discretion"). The Court of Appeals further opined that "the rules governing discovery would be ineffectual absent the trial court's authority to sanction their abuse." Id. (citing Mansfield v. Mansfield, No. 01A019412CH0058, 1995 WL 643329, at *5 (Tenn. Ct. App. Nov. 3, 1995)). In reaching its conclusion, the Alexander court "considered the balancing which the [trial] court must undertake in

---

[6]     Alexander, decided in 2004, preceded the adoption of Rule 34A.02.

-9-

determining what sanctions are appropriate under the circumstances" and held that the trial court did not abuse its discretion in dismissing the action. Id. at 17. The Alexander court explained, "Clearly, dismissal of the action was within the range of sanctions available to the trial court, and we cannot conclude that dismissal was an abuse of discretion." Id.

Therefore, in reviewing a trial court's decision to impose sanctions for the spoliation of evidence, Tennessee's appellate courts generally have analyzed the issue under either the common law doctrine of spoliation, including the prerequisite of intentional misconduct, or under the trial court's inherent authority and wide discretion to impose sanctions during the discovery process, without any discussion of this dichotomy. With this dichotomy in mind, we turn now to Rule 34A.02.

*Rule 34A.02*

Rule 34A.02 of the Tennessee Rules of Civil Procedure became effective on July 1, 2006. As set forth earlier, the Rule states, "Rule 37 sanctions may be imposed upon a party or an agent of a party who discards, destroys, mutilates, alters, or conceals evidence." Tenn. R. Civ. P. 34A.02. Under Rule 37, a trial court has the power to impose a variety of sanctions for failure to comply with a discovery order, including "dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party." Tenn. R. Civ. P. 37.02(C). Other potential sanctions pursuant to Rule 37 include, but are not limited to: an order designating that certain facts shall be taken to be established for the purposes of the action, see Tenn. R. Civ. P. 37.02(A); an order refusing to allow a party to support or oppose certain claims or to introduce certain matters into evidence, see Tenn. R. Civ. P. 37.02(B); an order staying the proceedings, see Tenn. R. Civ. P. 37.02(C); and contempt of court, see Tenn. R. Civ. P. 37.02(D).

Prior to Rule 34A.02, Rule 37 sanctions were limited to failures to comply with discovery orders and, therefore, generally were not available for the spoliation of evidence occurring prior to any such order. See Tenn. R. Civ. P. 37; Alexander, 156 S.W.3d at 15 (noting that Rule 37 does not "explicitly provide for sanctions for discovery abuse absent a court order"). Notably, however, in Mercer and Lyle, this Court upheld the inherent power of trial courts to impose sanctions to prevent abuse of the discovery process even while recognizing the fact that such sanctions were not expressly authorized by the Rules of Civil Procedure. Mercer, 134 S.W.3d at 133; Lyle, 746 S.W.2d at 699; see also Alexander, 156 S.W.3d at 15. Thus, the adoption of Rule 34A.02 effectively codified the inherent authority already recognized by Tennessee courts to impose sanctions during the discovery process. See Gross, 2007 WL 3171155, at *6 (noting that,

-10-

although Rule 34A.02 did not apply at the time of trial, "under both the pre-amendment and post-amendment rule, the court has broad discretion in deciding what sanctions, if any, are appropriate").

There are relatively few cases discussing the impact of Rule 34A.02 on the imposition of sanctions for the spoliation of evidence. In Cincinnati Insurance Co. v. Mid-South Drillers Supply, Inc., the Court of Appeals considered a trial court's dismissal as a sanction for the spoliation of evidence in light of Rule 34A.02. No. M2007-00024-COA-R3-CV, 2008 WL 220287, at *1-3 (Tenn. Ct. App. Jan. 25, 2008). In that case, the plaintiffs alleged that a high-pressure hose supplied by the defendants for use on a well-drilling machine was dangerous and defective and led to a damaging fire. Id. at *1. However, the hose was destroyed before the defendants were able to inspect it. Id. at *3. Finding that "without the missing hose the defendants would be severely prejudiced in their attempts to defend the claims asserted against them," the trial court dismissed all claims against the defendants as a sanction for the spoliation of the hose. Id. at *3. In affirming the trial court's decision, the Court of Appeals considered Rule 34A.02 and noted that "nowhere in [the rule] does it state that a finding of intentional destruction of evidence is required before a trial court can order sanctions under Rule 37." Id. at *4. Citing a trial court's "wide discretion to determine the appropriate sanction to impose for discovery abuses," the Court of Appeals reasoned,

> [The] destruction of the blue hose, whether advertent or inadvertent, made it extremely difficult if not impossible, for the defendants to present an effective defense to counter the plaintiff's theory of the cause of the fire. Since the plaintiff bears the sole responsibility for the loss of the evidence, and since any lesser sanction than dismissal would not have been an adequate remedy; the trial court did not abuse its discretion in its decision to sanction the plaintiff by dismissing [the] action.

Id. at *6; see also Griffith Servs. Drilling, LLC v. Arrow Gas & Oil, Inc., 448 S.W.3d 376, 379-81 (Tenn. Ct. App. 2014) (citing Rule 34A.02 and recognizing the trial court's wide discretion to impose sanctions for spoliation of evidence); McGrath v. Lowe's Home Ctrs., Inc., No. 3:06-0989, 2009 WL 151567, at *2 (M.D. Tenn. Jan. 21, 2009) (analyzing Rule 34A.02 and concluding that "in Tennessee, the trial court may impose Rule 37 sanctions for a Rule 34A violation, even if the loss of evidence by the adverse party is inadvertent").

However, even after the adoption of Rule 34A.02, the Court of Appeals has on several occasions continued to exclusively apply the doctrine of spoliation and the prerequisite of intentional misconduct without reference to Rule 34A.02 in situations

where a party moved for a sanction other than that of a negative inference. Bellsouth, 2011 WL 1642478, at *3-4 (relying on absence of evidence of intentional misconduct when one party moved for the claim to be dismissed as a sanction of the spoliation of evidence by the other party); Hensley, 2010 WL 845385, at *9 (declining a party's request to reverse certain damages on the ground of spoliation of evidence because no evidence of intentional misconduct); Kincade v. Jiffy Lube, No. W2007-00995-COA-R3-CV, 2008 WL 1970348, at *4 (Tenn. Ct. App. May 8, 2008) (applying the doctrine of spoliation and the prerequisite of intentional misconduct when a party moved for dismissal as a sanction for the spoliation of evidence). In Petty v. City of White House, the Court of Appeals upheld the trial court's denial of the defendants' motion to exclude evidence as a sanction for spoliation. No. M2008-02453-COA-R3-CV, 2009 WL 2767140, at *7-9 (Tenn. Ct. App. Aug 31, 2009). The Petty court expressly held that "Rule 37 does not provide a mechanism for excluding evidence on the basis of spoliation or violation of Rule 34A." Id. at *8-9. Instead, the Petty court analyzed the case under the doctrine of spoliation and, finding that there was no evidence of intentional misconduct, upheld the trial court's denial of the motion on that basis. Id.

### A Uniform Standard

In light of both Rule 34A.02 and the long-standing recognition discussed herein of a trial court's inherent authority and wide discretion in imposing sanctions to ensure fundamental fairness and the proper administration of justice, we hold that intentional misconduct is not a prerequisite for a trial court to impose sanctions for the spoliation of evidence, including that of a negative inference.[7] Indeed, while in the past under the common law doctrine of spoliation, there clearly was a prerequisite of intentional misconduct for a trial court to impose the specific sanction of a negative inference against the spoliating party, we see no reason to continue the requirement of intentional misconduct for the imposition of sanctions for the spoliation of evidence whether the sanction be imposed under the common law doctrine, under the inherent authority of the court, or under Rule 34A.02.[8] We hold today that the analysis for the possible imposition

---

[7]    In fact, we note that, even prior to the adoption of Rule 34A.02, the United States District Court for the Western District of Tennessee analyzed this Court's recognition of a trial court's inherent authority as discussed herein and concluded that, "because the Tennessee Supreme Court stresses that the trial court should have wide discretion to impose the appropriate sanction, the Court concludes that bad faith and an intentional and wrongful act are not prerequisites for imposing an adverse inference sanction." Clark, 229 F.R.D. at 140.

[8]    Indeed, although there continues to be disagreement among other jurisdictions, a number of other states have declined to apply intentional misconduct as a rigid prerequisite to sanctions for the spoliation of evidence and allow procedural sanctions or the imposition of an adverse inference for varying degrees

-12-

of any sanction for the spoliation of evidence should be based upon a consideration of the totality of the circumstances. To adopt an inflexible, bright-line rule restricting a trial court's power to fashion the appropriate remedy for spoliation of evidence would be contrary to the trial court's inherent authority to sanction abuses of the discovery process and to remedy the potential prejudice caused thereby. Therefore, intentional misconduct should not be a prerequisite to the imposition of some sanction under any approach. Rather, such determinations should be made on a case-by-case basis considering all relevant circumstances. Whether the conduct involved intentional misconduct simply should be one of the factors considered by the trial court.

The decision to impose sanctions for the spoliation of evidence is within the wide discretion of the trial court. See Mercer, 134 S.W.3d at 133; Gross, 2007 WL 3171155, at *7 (citing Thurman-Bryant, 1991 WL 222256, at *5). The determination of whether a sanction should be imposed for the spoliation of evidence necessarily depends upon the unique circumstances of each case. Factors which are relevant to a trial court's consideration of what, if any, sanction should be imposed for the spoliation of evidence include:

> (1) the culpability of the spoliating party in causing the destruction of the evidence, including evidence of intentional misconduct or fraudulent intent;

> (2) the degree of prejudice suffered by the non-spoliating party as a result of the absence of the evidence;

---

of reckless or negligent destruction of evidence. See Vesta Fire Ins. Corp. v. Milam & Co. Const., 901 So. 2d 84, 96 (Ala. 2004); Souza v. Fred Carriers Contracts, Inc., 955 P.2d 3, 6 (Ariz. Ct. App. 1997); Bunn Builders, Inc. v. Womack, No. 10-125, 2011 WL 2062393, at *11 (Ark. May 26, 2011); Aloi, 129 P.3d at 1002-03; Beers v. Bayliner Marine Corp., 675 A.2d 829, 833 (Conn. 1996); Beard Research, Inc. v. Kates, 981 A.2d 1175, 1192 (Del. Ch. 2009); R.A. Siegel Co. v. Bowen, 539 S.E.2d 873, 877-78 (Ga. Ct. App. 2000); Courtney v. Big O Tires, Inc., 87 P.3d 930, 933 (Idaho 2003); Keene v. Brigham & Women's Hosp., Inc., 786 N.E.2d 824, 832-33 (Mass. 2003); Bloemendaal v. Town & Country Sports Ctr., Inc., 659 N.W.2d 684, 686-87 (Mich. Ct. App. 2002); Miller v. Lankow, 801 N.W.2d 120, 127-28 (Minn. 2011); Bass-Davis v. Davis, 134 P.3d 103, 109 (Nev. 2006); Tri-Form Constr., Inc., 1 A.3d 658, 675 (N.J. 2010); McLain v. Taco Bell Corp., 527 S.E.2d 712, 716 (N.C. Ct. App. 2000); Oxford Presbyterian Church v. Weil-McLain Co., 815 A.2d 1094, 1104 (Pa. Super. Ct. 2003); Brookshire Bros., Ltd. v. Aldridge, 438 S.W.3d 9, 25 (Tex. 2014); Am. Family Mut. Ins. Co. v. Golke, 768 N.W.2d 729, 740 (Wis. 2009).

-13-

(3) whether, at the time the evidence was destroyed, the spoliating party knew or should have known that the evidence was relevant to pending or reasonably foreseeable litigation; and

(4) the least severe sanction available to remedy any prejudice caused to the non-spoliating party.[9]

A trial court's discretionary decision to impose a particular sanction "will be set aside on appeal only when 'the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of evidence.'" Mercer, 134 S.W.3d at 133 (quoting White v. Vanderbilt Univ., 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)). With regard to the specific sanction of dismissal of an action, although we recognize that the dismissal of an action is a severe sanction, we hold that "such a sanction would be appropriate in circumstances where any less severe remedy would not be sufficient to redress the prejudice caused" to the non-spoliating party by the loss of the evidence. Cincinnati Ins. Co., 2008 WL 220287, at *4.

In the instant case, the Plaintiff's vehicle was towed from the scene by a wrecker service immediately following the accident. Shortly thereafter, the Plaintiff's auto insurance provider informed her that the car was considered totaled and advised her to transfer the title of the car to the wrecker service, which she did. The Plaintiff testified during her deposition that she did not know that the wrecker service was going to destroy the vehicle. However, she did state, "I think someone did say that [the vehicle] was going to be compacted or something. I don't remember." Based on the record before us, it is clear that the tire was destroyed as a part of the routine practice shortly following an accident. There is no evidence that it was destroyed as the result of any intentional misconduct, including any fraudulent intent to conceal evidence on the part of the Plaintiff.

Regarding the prejudice caused to the Defendants by the absence of the tire, we note that neither party had the opportunity to examine the tire. The expert testimony presented by the Plaintiff seeks to establish that a flaw in the design or manufacturing of the tire led to its failure. The Plaintiff's expert, Dr. Sissom, did not examine the tire or offer any testimony regarding the tire specifically but only testified regarding the general

---

[9]    This multiple factor balancing approach is similar to the analysis adopted in numerous other jurisdictions. See Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994); Apple Inc. v. Samsung Elecs. Co., 888 F. Supp. 2d 976, 992 (N.D. Cal. 2012); Bancorp South Bank v. Herter, 643 F. Supp. 2d 1041, 1060 (W.D. Tenn. 2009); Story v. RAJ Props., Inc., 909 So. 2d 797, 802-03 (Ala. 2005); Beard, 981 A.2d at 1189; Lankow, 801 N.W.2d at 132; Robertet, 1 A.3d at 675; Belgarde v. Askim, 636 N.W.2d 916, 919 (N.D. 2001); Schroeder v. Commonwealth, 710 A.2d 23, 27 (Pa. 1998); Brookshire Bros., 438 S.W.3d at 21; Tracy v. Cottrell ex rel. Cottrell, 524 S.E.2d 879, 890 (W. Va. 1999).

nature of tire manufacturing and accidents caused by tire failure. Even with the absence of the tire, the Defendants are in a position, based on their own expertise, to refute such general testimony regarding the process of tire design and manufacturing and the potential flaws therewith.[10]

In its order denying summary judgment, the trial court stated,

> The [trial] [c]ourt further finds that the Defendant[s'] suggested sanction of dismissal of the action due to alleged spoliation of evidence by the Plaintiff is not warranted or appropriate in this case and is denied. Defendants suggest that the Plaintiff allowed a critical piece of evidence (the subject tire) to be lost. Plaintiff's proof suggests that the tire "shredded" and "completely disintegrated" after only being placed on her vehicle for less than 90 days prior to the unexpected explosion which Plaintiff alleges caused the accident in question. The Court finds that the Plaintiff did not intentionally participate in the destruction of such evidence following the accident in question and, therefore, the Defendant's request that the case be dismissed as a sanction for alleged spoliation of evidence is DENIED.

In making its decision, the trial court clearly relied heavily on the absence of intentional misconduct. Although not a prerequisite to the imposition of a sanction, the absence or presence of intentional misconduct is an important factor and the application and weight of such factor is within a trial court's wide discretion. Although the trial court did not expressly consider in its order any of the other factors discussed herein, nothing in the record supports the conclusion, as the Defendants suggest, that the trial court applied intentional misconduct as a rigid prerequisite to sanction. Therefore, we cannot conclude from the record that the trial court based its ruling on an incorrect legal standard. Nor can we, based on our own analysis of the record in light of the relevant factors, conclude that the trial court acted inconsistently with the substantial weight of the evidence. See Mercer, 134 S.W.3d at 133 ("Such a discretionary decision will be set aside on appeal only when 'the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence.'") (quoting White, 21 S.W.3d at 223). Based on the foregoing reasoning, we conclude that the trial court did not abuse its

---

[10]     By contrast, in Cincinnati Ins. Co., the plaintiff alleged a defect specific to the hose in question arising from an examination by its own expert of the allegedly defective hose prior to destruction and before the defendant had an opportunity to conduct its own examination. 2008 WL 220287 at *1-3; see also Griffith, 448 S.W.2d at 380 (declining to impose a sanction where spoliation equally hindered both parties).

discretion when it declined to dismiss the case as a sanction for the spoliation of evidence in this case. Therefore, we affirm the trial court's ruling.

Summary Judgment

The Defendants also assert that the trial court erred in denying their second motion for summary judgment. Specifically, the Defendants argue that, due to the absence of the tire, the Plaintiff cannot establish causation or that the tire was defective or unreasonably dangerous.

Our standard of review of a trial court's decision on a motion for summary judgment is de novo with no presumption of correctness. Parker v. Holiday Hospitality Franchising, Inc., 446 S.W.3d 341, 346 (Tenn. 2014).

A trial court should grant summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. Conversely, a trial court should not grant summary judgment when genuine issues or disputes of material fact are present. Parker, 446 S.W.3d at 346. A dispute of material fact is that which "must be decided in order to resolve the substantive claim or defense at which the motion is directed." Byrd v. Hall, 847 S.W.2d 208, 215 (Tenn. 1993).

In our recent opinion of Rye v. Women's Care Center of Memphis, MPLLC, __ S.W.3d __, No. W2013-00804-SC-R11-CV (Tenn. 2015), we overruled the summary judgment framework set forth in Hannan v. Alltel Publishing Co., 270 S.W.3d 1 (Tenn. 2008), and reinstated summary judgment standards consistent with Rule 56 of the Federal Rules of Civil Procedure and the Celotex trilogy of cases.[11]

Thus, as we stated in Rye, "when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." __ S.W.3d __, No. W2013-00804-SC-R11-CV. Under Tennessee Rule of Civil Procedure 56.03, the

---

[11]    The Celotex trilogy refers to three cases issued by the United States Supreme Court setting forth standards for summary judgment pursuant to Federal Rule of Civil Procedure 56. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 319 (1986).

moving party shall support its motion with "a separate concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact [is to] be set forth in a separate, numbered paragraph" and "supported by a specific citation to the record." Id. Once the moving party carries its burden under Rule 56, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading" but instead must respond and "set forth specific facts" at the summary judgment stage "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06.

To prevail on a products liability claim, a plaintiff must prove that the product was defective and/or unreasonably dangerous. Tenn. Code Ann. § 29-28-105(a) (2000). Claims based on products liability are governed by the Tennessee Products Liability Act of 1978 ("the Act"). See Tenn. Code Ann. §§ 29-28-101 to -108 (2000). The Act encompasses claims based on the following theories: "strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent, or innocent; misrepresentation, concealment, or nondisclosure, whether negligent, or innocent; or under any other substantive legal theory in tort or contract whatsoever." Tenn. Code Ann. § 29-28-102(6). Specifically, section 29-28-105 of the Act states:

> (a) A manufacturer or seller of a product shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.
>
> . . . .
>
> (d) A product is not unreasonably dangerous because of a failure to adequately warn of a danger or hazard that is apparent to the ordinary user.

Tenn. Code Ann. § 29-28-105.

*Defective Condition*

The Act defines a "defective condition" as "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn. Code Ann. § 29-28-102(2). Mere proof of an accident, by itself, does not establish that the product is defective. See Whaley v. Rheem Mfg. Co., 900 S.W.2d 296, 299 (Tenn. Ct. App. 1995). Rather, the plaintiff must establish that "something was wrong with the product." Id.

-17-

(quoting <u>Browder v. Pettigrew</u>, 541 S.W.2d 402, 406 (Tenn. 1976)) (internal quotation marks omitted).

<em>Unreasonably Dangerous Condition – Two Tests</em>

The Act defines "unreasonably dangerous" as follows:

> dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition.

Tenn. Code Ann. § 29-28-102(8). In <u>Ray ex rel. Holman v. BIC Corp.</u>, this Court determined that the Act's definition of "unreasonably dangerous" provided two alternative tests to determine whether a product is unreasonably dangerous: the consumer expectation test and the prudent manufacturer test. 925 S.W.2d 527, 533 (Tenn. 1996).

The consumer expectation test assesses "whether the product's condition poses a danger beyond that expected by an ordinary consumer with reasonable knowledge." <u>Id.</u> at 529 (citations omitted). Put another way, "[u]nder this test, a product is not unreasonably dangerous if the ordinary consumer would appreciate the condition of the product and the risk of injury." <u>Id.</u> at 530.

The prudent manufacturer test, on the other hand, assesses whether, given the imputed knowledge of the condition of the product, a prudent manufacturer would place such a product into the stream of commerce. <u>See</u> <u>id.</u>

The Defendants claim that a tire is a complex product and, therefore, that it should be assessed under the prudent manufacturer test rather than the consumer expectation test. In <u>BIC</u>, this Court discussed the applicability of the two tests with respect to "complex products" as follows:

> For example, ordinary consumers would have a basis for expectations about the safety of a can opener or coffee pot, but, perhaps, not about the safety of a fuel-injection engine or an air bag.
>
> . . . .

-18-

While the statute does not limit applicability of the tests, the prudent manufacturer test will often be the only appropriate means for establishing the unreasonable dangerousness of a complex product about which an ordinary consumer has no reasonable expectation.

925 S.W.2d at 531.

In Jackson v. General Motors Corporation, this Court rejected the defendants' argument that a seat belt was a complex product, stating,

The language in BIC upon which the defendant relies merely explains that it may be difficult for a plaintiff to establish that the product is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics," if the community has no ordinary knowledge about the product's characteristics. See Tenn. Code Ann. § 29-28-102(8). Our intent in BIC was not to limit the application of either test, but to hold that, in order to be successful under the consumer expectation test, the plaintiff must present evidence that the ordinary consumer has an expectation regarding the safety of the product. "What is determinative is what an ordinary purchaser would have expected." 925 S.W.2d at 531. The opinion in BIC clearly states that either the consumer expectation test or the prudent manufacturer test, or both, may be applied in all cases where the product is alleged to be unreasonably dangerous.

60 S.W.3d 800, 804 (Tenn. 2001). The Court ultimately decided that a seat belt was not a complex product, adopting the reasoning of an Alaska Supreme Court case that held, "[W]hen a seat belt designed to be an instrument of protection, becomes an instrument of life-threatening injury, a consumer is justified in concluding that it did not perform as safely as promised. A seat belt is a familiar product whose basic function is well understood by the general population." Id. at 805 (quoting Gen. Motors v. Farnsworth, 965 P.2d 1209, 1221 (Alaska 1998)) (internal quotation marks omitted).

We hold that a tire, though vastly different in function, is comparable in its analysis to that of a seat belt. Although the manufacturing process may be complex, the general driving populace understands the basic function and purpose of a tire. Therefore, we do not consider a tire "complex" for the purposes of considering the utility of the consumer expectations test. Accordingly, we may consider the consumer expectations test in determining whether summary judgment in this case was appropriate with respect to the Plaintiff's claim that the tire was unreasonably dangerous.

-19-

*Causation*

Causation is an essential element of the Plaintiff's claim, whether establishing that the product was defective or unreasonably dangerous. See Nye v. Bayer Cropscience, Inc., 347 S.W.3d 686, 704 (Tenn. 2011). The two types of causation, cause in fact and proximate cause, have been distinguished by this Court as follows:

> Cause in fact refers to the cause and effect relationship between the defendant's tortious conduct and the plaintiff's injury or loss. Thus, cause in fact deals with the "but for" consequences of an act. The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct. In contrast, proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established. Proximate or legal cause is a policy decision made by the legislature or the courts to deny liability for otherwise actionable conduct based on considerations of logic, common sense, policy, precedent and "our more or less inadequately expressed ideas of what justice demands or of what is administratively possible and convenient."

Snyder v. LTG Lufttechnische GmbH, 955 S.W.2d 252, 256 n.6 (Tenn. 1997) (citations omitted).

*Proof and Application*

In denying summary judgment in this case, the trial court found that "there are several factual disputes that are material to the outcome of the case and that such material factual disputes create genuine issues for trial."[12] We note that, in reviewing this evidence, the trial court "does not weigh the evidence, but must accept the nonmoving party's evidence as true, and view both the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to the nonmoving party." Shipley v. Williams, 350 S.W.3d 527, 551 (Tenn. 2011) (citing Martin v. Norfolk S. Ry. Co., 271 S.W.3d 76 84,

---

[12] In the trial court's order denying the Defendants' second motion for summary judgment, the court incorporated a letter written to the parties outlining its reasons for the denial. In that letter, the trial court incorporated and adopted its findings of facts and conclusions stated in the trial court's letter outlining its reasons for the denial of the Defendants' first motion for summary judgment. The quoted language is from the court's January 20, 2011 letter with respect to the Defendants' first motion for summary judgment.

87 (Tenn. 2008); <u>Giggers v. Memphis Hous. Auth.</u>, 277 S.W.3d 359, 364 (Tenn. 2009); <u>Kelley v. Middle Tenn. Emergency Physicians, P.C.</u>, 133 S.W.3d 587, 596 (Tenn. 2004)).

In order to conduct a de novo review of the trial court's decision, we must consider the deposition testimony provided in this case. Dr. Tammy Rogers testified that she was riding in the passenger's seat of her vehicle while her son, Matt, was driving at the time of the accident. She described the weather conditions on that day as "clear and sunny." Dr. Rogers then stated,

> Matt was driving and we got on the interstate. And I'm driving with a 16-year-old. So in case anybody asks, yes, I was paying a lot of attention because I was letting a 16-year-old drive. So I was in the passenger seat, and we were just driving. And we got into the left-hand lane to pass someone because there was probably more traffic than normal, being a holiday weekend. And so we were going around somebody, and we got behind a car that had – we had been following them for a couple of miles because they were also passing the cars that were there, and we noticed something started kind of flapping underneath the car.

Dr. Rogers stated that the vehicle in front of them was "driving in a normal fashion" and never drove on the "rumble strips" on the shoulder. She continued, "Matt and I both noticed something that was black and seeming to flap underneath the car. So at that point, we kind of watched it for maybe 30 seconds to a minute, and I told Matt[,] . . . . [s]low down and back off and give that car some room." She described the "flapping" as being "on the inside part of the tire." She estimated that what she saw "flapping" was approximately four to six inches long.

Dr. Rogers testified that, a few seconds after telling Matt to slow down, "something came out from under the car." She compared the object to "pieces of tire you see on the side of the road when semis have blow-outs." She testified that, after the object came off of the vehicle,

> [t]he car started going towards the median and it appeared that the driver tried to correct. And when they corrected, the car spun out. And so it spun back. So it had gone to the – to the median first, and then it spun back across the interstate, hit the guardrail and flipped.

Dr. Leighton Sissom, a registered professional engineer, testified as an expert for the Plaintiff. He stated that, because he did not have the opportunity to inspect the tire, he could not say with certainty whether the alleged defect was a design or manufacturing

defect. He stated, however, that "in general, defects that come out in tires relate to manufacturing more than design." He continued, "And there's – there's a good reason for that because despite our very mechanized manufacturing system, tires are pretty much made by hand. They're laid up by hand in the manufacturing process."

After discussing multiple alternative causes for a tire failure, Dr. Sissom stated that a design or manufacturing defect was more likely than not the cause of the failure. He reasoned, "Because of all the tire failures that I have examined, there have been design and/or manufacturing defects when the tire failed." Dr. Sissom acknowledged that there were cases in which, due to observed abuse of the subject tire, he determined that there was no defect. He also acknowledged that such abuse only could be found upon inspection of that tire.

Dr. Sissom surmised that a sudden loss in pressure in the tire caused the vehicle to veer to the left and that the Plaintiff then overcorrected the vehicle to the right, which ultimately caused the car to overturn. He confirmed that Dr. Rogers had testified that there was nothing unusual about the road surface or interstate conditions on the day of the accident. Dr. Sissom further surmised that the "flapping" Dr. Rogers observed was the tread of the tire separating from the rest of the tire. Based on the description given by Dr. Rogers, Dr. Sissom further opined that the tire failure was caused by a failure of adhesion based on a defect in the design or manufacture.

Moreover, based on the Plaintiff's deposition, in the three months between her buying the tires and the time of the accident, the Plaintiff did not recall "running over anything unusual in the road" or "hitting anything" with her vehicle. With respect to the day of the accident, the Plaintiff did not recall seeing anything wrong with her tires when she stopped for gas shortly before the accident, but she acknowledged that she did not intentionally look at the tires at that time.

Thus, based on our de novo review of the deposition testimony of Dr. Sissom, along with that of the Plaintiff and Dr. Rogers, we hold that the proof established a genuine issue of material fact as to whether a defect existed in the tire or that the tire "pose[d] a danger beyond that expected by an ordinary consumer with reasonable knowledge." BIC, 925 S.W.2d at 529. Accordingly, the trial court did not err in denying summary judgment to the Defendants.

## Apparent Manufacturer Doctrine

Finally, the Defendants contend that the trial court erred in applying the apparent manufacturer doctrine to the Defendants in this case. Specifically, the Defendants argue

that the apparent manufacturer doctrine has not been adopted in Tennessee[13] and, therefore, should not have been applied here. As part of the Defendants' motion for summary judgment, the Defendants argued that the trial court should grant summary judgment because the Defendants were not the manufacturers of the tire. Rather, according to the Defendants, the manufacturer was GITI Tire (Hualin), a corporation in China, who is not a party to this case. The trial court, in denying the Defendants' motion for summary judgment, stated,[14]

> The Court finds from the proof presented that each of the "Bridgestone" or "Firestone" defendants received the product tire in question, distributed the product/tire in question, and later sold, installed and warrantied the alleged defective product. Furthermore, that "Bridgestone" or "Firestone" defendants were in a position after it received the tire from "GITI Tire" to inspect the product (i.e. tire) in such a manner as to discover any defects.

> The Court further finds from the proof presented that the defendants "Bridgestone" or "Firestone" were subsequently involved in the labeling, marketing and selling of this product manufactured by "GITI Tire."

> The Court also finds that the "apparent manufacturer" of this product doctrine applies in this case to "Bridgestone Americas Holding, Inc." and BFS Retail and Commercial Operations, LLC., d/b/a Firestone Complete Auto Care.[]

> The Court also finds that a material factual dispute exists as to whether "GITI Tire (USA) Ltd." is in fact the same company as "GITI Tire (Hualin)." It appears from the proof that "GITI Tire USA" admits to importing the product tire from "GITI Tire (Hualin)" who it claims actually manufactured the product tire. "GITI Tire USA" was certainly in a position to inspect the product tire it received from "GITI Tire (Hualin)" because of its involvement in the importing, distribution, marketing and selling of this product tire.

---

[13] The apparent manufacturer doctrine is a doctrine used to hold a company vicariously liable for an injury even when that company is not the actual manufacturer of the product. See Bogart v. STP Corp., No. 82C-578, 1985 WL 301940, at *7 (Tenn. Ct. App. Oct. 2, 1985) (Lewis and Koch, JJ., concurring).

[14] This language is from the January 20, 2011 letter denying the Defendants' first motion for summary judgment, which the trial court incorporated into its order denying the Defendants' second motion for summary judgment.

From our review of the trial court's order denying summary judgment, it appears that the trial court only applied the apparent manufacturer doctrine to Defendant Bridgestone Retail Operations, LLC ("Defendant Bridgestone"), and not to Defendant GITI Tire (USA) Ltd ("Defendant GITI Tire USA"). Therefore, we only need to consider this issue with respect to Defendant Bridgestone. Additionally, from our review of the trial court's order, we note that the trial court applied the apparent manufacturer doctrine only as an alternative theory for liability. Instead, the trial court primarily relied on Defendant Bridgestone's potential liability as a seller.

At the time this action accrued, the Act stated,[15]

> No "product liability action," as defined in § 29-28-102(6), shall be commenced or maintained against any seller . . . when the product is acquired and sold by the seller under *circumstances in which the seller is afforded no reasonable opportunity to inspect the product* in such a manner which would or should, in the exercise of reasonable care, reveal the existence of the defective condition.

Tenn. Code Ann. § 29-28-106(a) (2000) (emphasis added).

---

[15] The statute in effect at the time this action accrued varies substantially from the current statute, enacted in 2011:

> No product liability action, as defined in § 29-28-102, shall be commenced or maintained against any seller, other than the manufacturer, unless:
>
> (1) The seller exercised substantial control over that aspect of the design, testing, manufacture, packaging or labeling of the product that caused the alleged harm for which recovery of damages is sought;
>
> (2) Altered or modified the product, and the alteration or modification was a substantial factor in causing the harm for which recovery of damages is sought;
>
> (3) The seller gave an express warranty as defined by title 47, chapter 2;
>
> (4) The manufacturer or distributor of the product or part in question is not subject to service of process in this state and the long-arm statutes of Tennessee do not serve as the basis for obtaining service of process; or
>
> (5) The manufacturer has been judicially declared insolvent.

Tenn. Code Ann. § 29-28-106 (2012).

Put another way, a products liability action may be brought against a seller if the seller "is afforded [a] reasonable opportunity to inspect the product in such a manner which would or should, in the exercise of reasonable care, reveal the existence of a defective condition." Id. Applying this statute to the case before us, the Plaintiff cannot maintain this action against Defendant Bridgestone unless the Plaintiff can establish that Defendant Bridgestone had an opportunity to inspect the tire at issue and discover the defect alleged to have caused the accident.

James Selewski, a Customer Experience Manager and Tire Specialist for Firestone Complete Auto Care, testified by deposition that, prior to 2007, he was a Sales Associate with Firestone at its Murfreesboro location. He had worked as a sales associate at Wal-Mart and then Firestone since 2000. In approximately 2007 or 2008, Firestone began to carry the Primewell tire. He stated that the Primewell tire is manufactured by GITI Tire.[16] According to Selewski, he knew that GITI Tire was the manufacturer because GITI's name was stamped on the tire. Primewell tires, as well as all other tires carried in the store, would be delivered to the store from a Bridgestone/ Firestone truck. Selewski stated that the tires delivered were stacked in the truck and would be "rolled" off the truck and into the store. Regarding any inspection performed by the store, Selewski testified, "When catching them, or when you're stacking them up, you might take a look to see if there's any possible damage to the bead, or if there's anything really obvious that you may notice on the tire." Selewski denied that any other type of inspection of the tire occurred at the store, except by the person installing the tire onto the vehicle. Selewski believed that the Primewell tire carried a 40,000 mile limited warranty provided by Bridgestone/ Firestone.

Selewski did not recall having customers who came in with complaints regarding the Primewell tires. He reviewed the Plaintiff's sales receipt from March 2, 2008, and confirmed that he was listed as the service advisor. He did not recall that any signs were posted in the store indicating that some of the tires in the store were not manufactured by Bridgestone/ Firestone.

Andy Kendall testified by deposition that he had worked as an automotive technician for Firestone Complete Auto Care for approximately seven years. He stated that tires in the store are inspected prior to installing the tires onto a client's vehicle. In that regard, he testified,

---

[16] Given that there is no dispute that GITI Tire (Hualin) is the manufacturer of the tire, we assume Selewski is referring to GITI Tire (Hualin).

First, we check to make sure that it is the tire that is on the work order to be put on the vehicle. We make sure it's the correct size. And then we'll take a – do a visual inspection on the outside of the tire, make sure that it doesn't look like it's been messed up in any way or there's any holes in it or, like, any beads or bent from – from shipping.

Kendall estimated that the visual inspection took approximately twenty to thirty seconds to complete. As a general practice, once the tires were installed, he would "use [the] air pressure gauge and make sure all the tires are set to manufacturer specification for the vehicle." From looking at the work order for the Plaintiff's vehicle from March 2, 2008, Kendall noted that he had recommended that all four tires be replaced, but the Plaintiff chose to replace only two tires, which were installed on the rear of her vehicle.

Based on our de novo review, and viewing this evidence "in the light most favorable to the nonmoving party," Shipley, 350 S.W.3d at 551, we conclude that the proof established a genuine issue of material fact as to whether Defendant Bridgestone had an opportunity to inspect the tire at issue and discover the defect alleged to have caused the accident. See Tenn. R. Civ. P. 56.04. As a result, because the trial court's denial of summary judgment was proper based upon the Act's provision for seller liability under Tennessee Code Annotated section 29-28-106(a), we need not resolve the issue of application of the apparent manufacturer doctrine in Tennessee or with respect to Defendant Bridgestone. Accordingly, Defendant Bridgestone is entitled to no relief on the basis of this issue.[17]

---

[17] As stated earlier, the trial court did not apply the apparent manufacturer doctrine to Defendant GITI Tire USA. Therefore, Defendant GITI Tire USA also is not entitled to relief based on this issue.

# CONCLUSION

We hold that the trial court did not err in refusing to dismiss the Plaintiff's case as a sanction for spoliation of evidence. Additionally, we hold that the trial court did not err in denying the Defendants' second motion for summary judgment. Finally, we conclude that it is not necessary to determine whether the apparent manufacturer doctrine applies in Tennessee because a genuine issue of material fact exists with regard to Defendant Bridgestone's potential liability as a seller. Accordingly, we affirm the judgment of the trial court. Costs of this appeal are assessed to the Defendants and their surety, for which execution may issue if necessary.

_____
JEFFREY S. BIVINS, JUSTICE